MARCUS BROWN HOLDING COMPANY, INC., *v.* FELDMAN ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 731.    Argued March 3, 7, 1921.—Decided April 18, 1921.

1. In view of the emergency declared by the legislature and found by the District Court in this case and in like cases by the highest court of the State, the New York laws enacted on September 27, 1920, to be in effect only until November 1, 1922, and regulating rights and remedies in respect of real property occupied for dwelling purposes in and about the City of New York, do not exceed the police power of the State in requiring that only reasonable rents shall be exacted or in denying the right to maintain actions to recover possession except upon the grounds that the occupant is holding over and is objectionable, or that the owner of record, being a natural person, seeks in good faith to recover for immediate occupancy by himself and family as a dwelling, or that the action is to recover possession for the purpose of demolishing the building with intention to construct a new one. P. 198. *Block* v. *Hirsh, ante,* 135.

2. *Held,* that such regulation, as applied in favor of tenants holding over under an expired lease in disregard of their covenant to surrender, did

not deprive the landlord of rights under the Fourteenth Amendment or the Contract Clause of the Constitution, although the lease was executed before and expired soon after the date of the legislation and the landlord before the enactment had entered into a new lease with a third party to go into effect shortly after the expiration of the old one. P. 198.

3. The legislation does not unduly discriminate in not including cities of less than a specified population, or buildings occupied otherwise than for dwelling purposes, or buildings in course of construction. P. 198.

4. Chapter 951 of the Laws of New York of 1920, in so far as it makes it a misdemeanor for the owner of an apartment house, or his agents, etc., wilfully and intentionally to fail to furnish to the tenant of an apartment such water, heat, light, elevator, telephone, or other service as may be required by the terms of the lease and necessary to the proper and customary use of the building, cannot be said to impose involuntary service in violation of the Thirteenth Amendment. P. 199.

269 Fed. Rep. 306, affirmed.

THIS was a direct appeal, under § 266 of the Judicial Code, from a decree of the District Court in a suit brought by the owner of an apartment house in New York City for the purpose of ousting certain holding-over tenants through a mandatory injunction, and of restraining the District Attorney of the County of New York from taking criminal proceedings against the plaintiff or its agents for failure to furnish water, heat, light, elevator and other service. The defendants relied on recent legislation of New York, referred to in the opinion,[1] regulating the

---

[1] The following summary of the chief features of these New York "housing acts" is added for the convenience of those who desire a quick view.

*C. 942, Laws of 1920,* declares a public emergency to exist, and provides that summary proceedings shall not be maintainable to recover the possession of real property occupied for dwelling purposes in a city of a population of one million or more or in a city in a county adjoining such a city, except (1) where the person holding over is objectionable, (2) where the owner of record, being a natural person, desires the

rights and remedies of landlords and tenants in New York City and vicinity,—which the plaintiff assailed as unconstitutional. The District Court sustained the legislation, as it applied to the case, and dismissed the bill. See 269 Fed. Rep. 306. The facts are given in the opinion, *post*, 196.

---

premises for immediate and personal occupancy by himself and his family as a dwelling, (3) where the owner intends to demolish the premises and rebuild, or (4) where the building is to be taken over by a coöperative ownership group. The landlord must show that the proceeding is one mentioned in the enumerated exceptions. The act is inapplicable to buildings in course of construction or commenced after the date of the act, and is to be in effect only until November 1, 1922.

*C. 943, Laws of 1920*, regulates stays on appeals from final orders in summary dispossession proceedings.

*C. 944, Laws of 1920, amending c. 136, Laws of 1920:*

Section 1, after reciting the existence of a public emergency, declares that it shall be a defense to an action for rent accruing under an agreement for premises in a city of the first class, etc., occupied for dwelling purposes, that such rent is unjust and unreasonable and that the agreement under which the same is sought to be recovered is oppressive.

Section 2 requires the landlord, where the defense of unreasonable rent is set up, to file a bill of particulars setting forth certain material facts relevant to the issue of the reasonableness of the rent.

Section 3 provides that where it appears that the rent has been increased over the rent as it existed one year prior to the time of the agreement under which the rent is sought to be recovered, such agreement shall be presumptively unjust, unreasonable and oppressive.

Section 4 permits the landlord to plead and prove in such action a fair and reasonable rent and to recover judgment therefor, or to institute a separate action for the recovery thereof.

Section 5. Where, in an action for rent or rental value, the landlord secures judgment by default, he shall, in addition to a money judgment, be put in possession if payment be not promptly made.

Section 6. If, in such action for rent or rental value, the issue of reasonableness of the amount demanded be raised by the defendant, he must deposit in court a sum equal to the amount paid as last month's rent or the rent reserved as the monthly rent in the agreement under which he obtained possession, such deposit to be applied to the satisfac-

*Mr. Joseph A. Seidman* for appellant:

From the earliest colonial days to the present time the people of the State of New York have refused to delegate to its legislative bodies the power to interfere

---

tion of the judgment rendered, or otherwise disposed of as justice requires. Where judgment is rendered for the plaintiff, if the same be not fully satisfied from the deposit or otherwise within five days after entry, the plaintiff shall be entitled to the premises and a warrant shall issue commanding the sheriff, etc., to remove all persons therefrom.

Section 7 relates to the vacation of default judgments, to vacation and amendment of process, etc., and granting of new trials.

Section 8. "In case of an appeal by the defendant, the execution of the judgment and warrant shall not be stayed unless the defendant shall deposit with the clerk of the court the amount of the judgment and thereafter monthly until the final determination of the appeal an amount equal to one month's rental computed on the basis of the judgment. The clerk shall forthwith pay to the plaintiff the amount or amounts so deposited."

Section 9 renders the act inapplicable to hotels containing 125 rooms or more or to lodging or rooming houses occupied under a hiring of a week or less.

Section 10 exempts buildings in course of construction or commenced after the date of the act. The act is to be in force only until November 1, 1922.

*C. 945, Laws of 1920*, allows summary dispossession proceedings for nonpayment of rent, only where the petitioner alleges and proves that the rent is no greater than the amount for which the tenant was liable for the month preceding the default, and provides for testing the reasonableness of the rent in substantially the same manner as in an action for rent, which is regulated by c. 944, *supra*. In effect only until November 1, 1922.

*C. 947, Laws of 1920*, limits until November 1, 1922, the action of ejectment, in substantially the same manner as c. 942, *supra*, limits summary proceedings.

*C. 951, Laws of 1920*, amending § 2040 of the Penal Law, makes it a misdemeanor for any lessor or his agents, etc., wilfully or intentionally to fail to furnish necessary hot or cold water, heat, light, power, elevator service, telephone or any other service, required by the lease, or wilfully and intentionally to interfere with the quiet enjoyment of the leased premises by the occupant.

with the recognized rights of private property. By the first state constitution, of 1777, such parts of the common law of England and the statutes of the Colony as were not repugnant to the constitution were continued. Fundamental and acknowledged principles were perpetuated. *Gautier* v. *Ditmar*, 204 N. Y. 20; *Waters & Co.* v. *Gerard*, 189 N. Y. 302; *Underwood* v. *Daniell*, 50 N. Y. 274.

Except in the abatement of public nuisances or to avoid imminent danger, property cannot be taken or destroyed by the legislature without compensation, and it cannot be taken even with compensation, except for public use. Constitution of New York, Art. I, §§ 1, 6; Fourteenth Amendment; *Brevoort* v. *Grace*, 53 N. Y. 245, 255; *People* v. *Fisher*, 190 N. Y. 468; *Rockwell* v. *Nearing*, 35 N. Y. 302; *Powers* v. *Bergen*, 6 N. Y. 359; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166, 177, 178; *Embury* v. *Conner*, 3 N. Y. 511.

Due process may be tested by the common law as settled in England before the Declaration of Independence, *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 276; *Lowe* v. *Kansas*, 163 U. S. 81; but our opponents are compelled to invoke decisions on laws authorized expressly by state constitutions or on powers incidental to the express powers of Congress; to rely upon the rules of Ancient Rome governing the rights of serfs and tenants who were mere slaves, upon the Irish Land Bills, and upon laws enacted here and by Parliament during the World War. They might have gone further and asked us to adopt as laws the decrees of Soviet Russia.

Wherever legislation has been sustained as necessary to secure the health, welfare, safety, and good order of the community, it was prospective and not retroactive; it related to future conduct and did not affect past transactions, except where enacted by express consti-

tutional authority. *Buffalo* v. *Chadeayne,* 134 N. Y. 163. Retroactive legislation destroys vested rights and interests in property. The police power is a regulatory power. Again, legislation under police power must be for the general public and not for a particular class or for the benefit of private individuals. *Eubank* v. *Richmond,* 226 U. S. 137.

The State may not, except in the case of monopolies and public utilities, compel the sale of merchandise or license the use of private property, even for compensation. *Terminal Taxicab Co.* v. *District of Columbia,* 241 U. S. 252, 256; *Producers Transportation Co.* v. *Railroad Commission,* 251 U. S. 228, 252; *Chesapeake & Potomac Telephone Co.* v. *Manning,* 186 U. S. 238, 247.

We are told that what shall be regulated depends entirely upon the peculiar economic and social conditions of the times. If once the door shall be opened to that doctrine, all significance of the constitutional guaranty will be lost. "Illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure." *Boyd* v. *United States,* 116 U. S. 616, 635.

It is true that shelter is as much a necessity as bread, and it is contended that it is an obligation of the State to see that its citizenry does not lack such necessities. But it is not contended that the State should provide them gratis for physically and mentally able citizens. Should not the State afford gainful employment to those who lack such necessities? Or is the trader or manufacturer to be compelled by law to do so, or the banking institutions to furnish the needed money?

If in the opinion of the legislature the alleged emergency justified the exercise of the power of eminent domain, it should have authorized the taking of the property for public use in accordance with the state constitution. *Stell* v. *Mayor,* 95 N. J. L. 38.

The sponsors of the legislation urge "emergency" to silence the laws while citizens are being deprived of their property rights. They demand that constitutional bulwarks created for the protection of liberty and property be destroyed because of an alleged "public necessity," for alleged humanitarian causes. Similar distressing conditions and alleged "emergencies" were urged before this court (*Edwards* v. *Kearzey*, 96 U. S. 595, 604) in support of the Homestead Exemption Laws of North Carolina to uphold their constitutionality in so far as they affected obligations contracted before they came into effect. Mr. Justice Swayne, who delivered the majority opinion, went into the history of the country preceding the adoption of the Constitution, in order to show that the very purpose of the constitutional prohibitions was to prevent legislatures from meddling with private business and from tampering with obligations of contract in times of stress.

It often happens that a contract becomes impossible of performance because of a law subsequently enacted. There is a consequent impairment of performance, *Louisville & Nashville R. R. Co.* v. *Mottley*, 219 U. S. 467, 482, 484, but not of obligation. The statutes now under consideration impair the obligation, and not merely the performance of the obligation. The legislature left the tenant free to perform his obligation, if he so desired, but at the same time it discharged him from that obligation for the sole purpose of preventing its enforcement by the lessor. The law operates directly upon the contract,—destroys it completely without prohibiting its performance. The impairment of the obligation is not the indirect result of police regulation of the conduct of particular business. These laws were not enacted for the regulation of the business of the landlord.

The legislature assumed authority to discharge the obligation of the tenant to surrender possession on the

expiration of the term specified in the lease; to make a trespass a lawful possession; to extend all of the lessor's obligations while the holdover desires to continue in possession; to prevent the lessor from performing his obligation under another lease entered into before the enactment of the law, which by its terms was to become operative after the date of this enactment. In exercising this power the legislature has not imposed upon the person holding over the obligation to pay the rent reserved in his lease, the stipulated rental value as fixed by the parties is disregarded. The power to fix the rental value is delegated to a court or jury. Such innovations are clearly repugnant to the Constitution. *Wilmington & Weldon R. R. Co. v. King*, 91 U. S. 3, 5; *Effinger v. Kenney*, 115 U. S. 566, 571.

The rule has always been that, as a State cannot enact a law acting directly upon the terms of the contract, so also it cannot pass a law professing to regulate the remedy when, in effect, it impairs the obligation of the contract. *Gantly v. Ewing*, 3 How. 707; *Barnitz v. Beverly*, 163 U. S. 118; *Nelson v. St. Martin's Parish*, 111 U. S. 716; *McGahey v. Virginia*, 135 U. S. 662; *Kring v. Missouri*, 107 U. S. 221; *Fletcher v. Peck*, 6 Cranch, 87, 138; *People v. Batchellor*, 53 N. Y. 128, 140; *Brevoort v. Grace*, 53 N. Y. 245; *Adair v. United States*, 208 U. S. 161, 173.

Upon the failure of the tenants to surrender possession on September 30, 1920, the plaintiff had at least five remedies, namely: (1) To treat the tenancy as one at will or sufferance and terminate it by giving the notice required by statute (unnecessary at common law, *Reckhow v. Schanck*, 43 N. Y. 448); (2) to treat the lease as renewed for another year (*Herter v. Mullen*, 159 N. Y. 28); (3) to reënter and by use of reasonable force eject the occupants; (4) to maintain the common-law action of ejectment; or (5) to sue in trespass for damages. The law then in force assured to the owner the right to

possession. on the expiration of the term, and imposed upon the tenant the obligation to surrender. That right could not be taken or the obligation destroyed without due process of law. *Muhlker* v. *New York & Harlem R. R. Co.*, 197 U. S. 544, 570; *Barson* v. *Mulligan*, 198 N. Y. 23, 25; *Adams* v. *Cohoes*, 127 N. Y. 175, 182. For a breach of the covenant to surrender the lessor was entitled to recover damages. *Vernon* v. *Brown*, 40 App. Div. 204. All of these rights were secured to the plaintiff and its grantors under the common law in force at the time of the adoption of the State and Federal Constitutions. They were annexed to the contract at the time it was made. *Bronson* v. *Kinzie*, 1 How. 311; *McCracken* v. *Hayward*, 2 How. 608; *Walker* v. *Whitehead*, 16 Wall. 314. Forfeitures of such rights in property cannot be adjudged by legislative act, and confiscations without a judicial hearing after due notice are void. Yet this is exactly what these innovations undertake to do. The person applying for his remedies is not permitted to come into court. *Gilman* v. *Tucker*, 128 N. Y. 190, 205; *Missouri Pacific Ry. Co.* v. *Humes*, 115 U. S. 512, 521.

Statutes affecting remedies which do not impair the obligation of contract may be constitutionally valid, provided a reasonable time be allowed before the change or repeal of remedy takes effect. Cooley, Const. Lim., 6th ed., p. 431; *Wheeler* v. *Jackson*, 137 U. S. 245; *Antoni* v. *Greenhow*, 107 U. S. 769. Usury has been regarded with abhorrence from the earliest times, and yet any law declaring a transaction illegal because of usury, which was legal when made, would be constitutionally void. *Sturges* v. *Crowninshield*, 4 Wheat. 122, 206; *Van Rensselaer* v. *Snyder*, 13 N. Y. 299; *Conkey* v. *Hart*, 14 N. Y. 22; *Von Hoffman* v. *Quincy*, 4 Wall. 535, 552. These laws clog not only the right to recover possession, but also the right to recover the rent voluntarily agreed upon by the contracts in force when they were enacted.

"The general right to make a contract in relation to his business is part of the liberty of the individual protected by the Fourteenth Amendment." *Lochner* v. *New York,* 198 U. S. 45, 53. In all such cases as *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389; *Mobile* v. *Yuille,* 3 Ala. N. S. 140; *Louisana Bread Case,* 12 La. Ann. 432, the control of the property was left entirely to the owner engaged in the particular business regulated. In the *Lewis Case* the court points out that the business of insurance is essentially different from ordinary commercial transactions, and, according to the sense of the world from the earliest times,—certainly the sense of the modern world,—is of the greatest public concern. It was not a private business, but "clothed with a public interest," and therefore subject "to be controlled by the public for the common good."

If the leasing of dwelling houses and apartments were a business charged with a public use, the legislation would be nevertheless unconstitutional, because it inhibits the owner from withdrawing his property from the alleged public use. *Munn* v. *Illinois,* 94 U. S. 113, 126, 133; *Budd* v. *New York,* 143 U. S. 517, 536. It compels him to continue the business with persons with whom he does not desire to deal. The owner's intention cannot possibly be determined, as to whether he desires to continue the business of renting dwelling houses, until the possession of his property is restored to him.

These laws are also unconstitutional because they violate the guaranty of equal protection of the laws in disregard of the Fourteenth Amendment. *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, 558, 559. The right to maintain summary proceedings and actions of ejectment is still reserved to that class of landowners who may desire to destroy their buildings for the purpose of erecting new buildings, to those desiring the premises for personal occupancy and to owners of office, factory

or other buildings occupied for business purposes and to owners of hotel property; to every owner of property in cities of the third class and in some instances to the owners of property in cities of the second class; to owners of buildings now in course of construction or which may hereafter be erected. The housing conditions and congestion prevail all over the country and in every city in the State of New York. Therefore, there was no reasonable ground for the classification.

Assuming that the State has the power, directly or indirectly, to subsidize new buildings either by cash payments or by remission of taxes, it has no power to discriminate between the owners of existing buildings and the owners of buildings to be erected, in respect of their compensation for the use of their property. *Merchants' & Manufacturers' Bank* v. *Pennsylvania,* 167 U. S. 461, 463; *Cotting* v. *Kansas City Stock Yards Co.,* 183 U. S. 79, 112.

The legislation creates involuntary servitude, prohibited by the Thirteenth Amendment. The legislature, by c. 951, has practically made landlords persons subject to compulsory service, who must serve "statutory tenants" in possession of their property, against their will and consent. *Clyatt* v. *United States,* 197 U. S. 207, 216. This legislation in effect declares a suspension for a period of two years of the landowner's civil rights guaranteed to him by the State and Federal Constitutions, which secure to him the liberty to refuse business relations with anyone with whom he does not desire to contract. Similar legislation has been condemned. *Adair* v. *United States,* 208 U. S. 161; *Bailey* v. *Alabama,* 211 U. S. 452; *People* v. *Marcus,* 185 N. Y. 257.

No emergency can justify an exercise of legislative power to compel one man to render involuntary service to another. *Ex parte Milligan,* 4 Wall. 2, 18.

*Mr. David L. Podell,* with whom *Mr. Samuel R. Gerstein, Mr. Martin C. Ansorge, Mr. Benjamin S. Kirsh* and *Mr. J. J. Podell* were on the brief, for the tenant appellees.

*Mr. Robert S. Johnstone* and *Mr. John Caldwell Myers* filed a brief on behalf of Edward Swann, as District Attorney of the County of New York, appellee:

The District Court had no jurisdiction to entertain the suit as it did not appear that the matter in controversy exceeded three thousand dollars.

The complainant has a plain, adequate and complete remedy at law.

Chapter 951, Laws of New York 1920, is a valid exercise of the State's police power. *Price* v. *Illinois,* 238 U. S. 446, 451; *Sligh* v. *Kirkwood,* 237 U. S. 52, 59; *Chicago & Alton R. R. Co.* y. *Tranbarger,* 238 U. S. 67; *Manigault* v. *Springs,* 199 U. S. 473, 480; *Tenement House Department* v. *Moeschen,* 179 N. Y. 325.

*Mr. William D. Guthrie,* with whom *Mr. Julius Henry Cohen, Mr. Elmer G. Sammis* and *Mr. Bernard Hershkopf* were on the brief, for the Attorney General of the State of New York, by special leave of court:

The existence of an emergency in the City of New York and the evidence of the shortage of housing accommodations and the danger to be apprehended from widespread evictions are exhibited by the official reports, such as the messages of the Governor to the legislature, the reports of his Reconstruction Commission, the reports of the Joint Legislative Committee on Housing, the report of the Mayor's Committee on Rent Profiteering in the City of New York, and the bulletins of the Health Department of the City of New York.

Perhaps no legislation was ever passed by the legislature which was the subject of more exhaustive investigation, and the reports above referred to are, therefore,

entitled to even greater weight than is usually accorded such official findings and documents. *Wilson* v. *New*, 243 U. S. 332; *McLean* v. *Arkansas*, 211 U. S. 539, 547, 548; *People* v. *Charles Schweinler Press*, 214 N. Y. 395, 402; *Cockcroft* v. *Mitchell*, 187 App. Div. 189, 193.

In view of the facts thus revealed it cannot be reasonably doubted that a shortage of housing facilities still exists and it can hardly be seriously suggested that the legislature was acting arbitrarily in fixing November 1, 1922, as the probable duration of the emergency or crisis. Longer periods have been adopted in some jurisdictions. If the prediction does not square with the facts as they develop in the future, the courts can grant relief, even if the legislature should neglect to do so. *Castle* v. *Mason*, 91 Oh. St. 296, 303. See also *Sullivan* v. *Shreveport*, 251 U. S. 169, 171; *Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146, 162; *Johnson* v. *Gearlds*, 234 U. S. 422, 446; *Perrin* v. *United States*, 232 U. S. 478, 486; *Municipal Gas Co.* v. *Public Service Commission*, 225 N. Y. 89, 95, 97. It may not, however, be presumed that when that time comes the legislature will not itself repeal these laws.

In determining the constitutionality of statutes passed in the exercise of the police power, the courts have attached much weight to analogous legislation in other countries enacted to remedy similar conditions or to meet similar governmental problems. *Muller* v. *Oregon*, 208 U. S. 412, 419, 420; *People* v. *Charles Schweinler Press*, 214 N. Y. 395, 403. The conditions in New York City were the same as those which existed in all congested centers throughout the world as a result of the World War. Like causes had produced like effects.

Neither the contract clause nor the due process clause of the Constitution abridges the power or duty of the legislature to enact appropriate and necessary laws in order to protect the health, safety, order, morals, or gen-

eral welfare of the public. *Hadacheck* v. *Los Angeles,*
239 U. S. 394, 409, 410; *Nechamcus* v. *Warden,* 144 N. Y.
529, 535; *Louisville & Nashville R. R. Co.* v. *Mottley,* 219
U. S. 467; *Producers Transportation Co.* v. *Railroad Com-
mission,* 251 U. S. 228, 232; *Union Dry Goods Co.* v. *Geor-
gia Public Service Corporation,* 248 U. S. 372, 375.

Laws which forbade the erection of certain types of
buildings, which prohibited certain kinds of businesses,
fixed certain prices, abolished certain valuable remedies,
like distress, etc., have all been uniformly upheld as valid
exercises of the police power notwithstanding the fact
that they seriously impaired or wholly wiped out pre-
existing private contracts. The only inquiry has been
whether the statute in question was a proper exercise of
the power of government, that is, whether in any aspect
it could be regarded as passed in the public interest and
as reasonably calculated to subserve that interest, due
allowance being made for the broad discretion vested in
the legislative body in these respects, and whether the
means were reasonably appropriate and adapted to a
legitimate end. If it were possible for individuals to
estop due exercises of governmental power by private
contracts, private agreements could impair the legislative
power in practically all classes of cases.

Nor is the question to be decided put upon any dif-
ferent basis by urging that the statutes interfere with
the liberty of contract as distinguished from the impair-
ment of contract. That right is and may also be qualified
and limited in the public interest. *Chicago, Burlington
& Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549, 567;
*McLean* v. *Arkansas,* 211 U. S. 539, 545; *Rail & River
Coal Co.* v. *Ohio Industrial Commission,* 236 U. S. 338, 349.

Equally immaterial is it that the statutes interfere
with property rights. That, too, may be lawfully done
by the legislature in the reasonable exercise of its police
power. It constitutes but a taking by due process of

law if it be really a taking at all.—Citing many cases, including: *Chicago, Burlington & Quincy Ry. Co.* v. *Drainage Commissioners,* 200 U. S. 561, 593; *Nechamcus* v. *Warden,* 144 N. Y. 529, 535; *In re Wilshire,* 103 Fed. Rep. 620, 622; *Noble State Bank* v. *Haskell,* 219 U. S. 104, 111; *People* v. *Griswold,* 213 N. Y. 92, 96, 97; *Armour & Co.* v. *North Dakota,* 240 U. S. 510, 513; *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549, 569. Here the State requires only such a concession as it has been repeatedly held by this court government is constitutionally entitled to require, namely, a concession appropriate to "exceptional times and places in which the very foundations of public welfare could not be laid without requiring concessions from individuals to each other upon due compensation which under other circumstances would be left wholly to voluntary consent." *Strickley* v. *Highland Boy Gold Mining Co.,* 200 U. S. 527, 531. See also *Clark* v. *Nash,* 198 U. S. 361; *Noble State Bank* v. *Haskell,* 219 U. S. 104, 110.

There is no force in the contention that these laws are solely in the private, as contrasted with the public, interest because they redound to the benefit of private parties, namely, tenants. Use by the general public is inadequate as a universal test. *Strickley* v. *Highland Boy Gold Mining Co.,* 200 U. S. 527, 531. Witness the usury laws, laws regulating railroad rates, tenement house laws, and the employers' liability acts.

Courts are not at liberty to circumscribe the police power by impracticable points of view or by unreasonably pressing the alleged "absolute" rights of property. The police power exists to meet the practical problems which arise from day to day; and the science of government consists in adjusting relative rights and duties in order "to promote the general welfare." *Noble State Bank* v. *Haskell, supra.*

These laws are not unreasonable in laying the burden

on the landlord of showing that the rent is reasonable, or in preventing him from retaking possession oppressively, where he does not require it for his own use, or to rebuild, and where the tenant is not objectionable. In every fair and reasonable situation he may have his property; but where he desires to evict without reason, the law prohibits his doing so during the shortage and crisis, provided the tenant pays the reasonable rental value of the premises.

If these enactments appear in any aspect extraordinary, it is only because the crisis is unprecedented; and it was long ago declared that (*Legal Tender Cases,* 12 Wall. 457, 540) "It is not to be denied that acts may be adapted to the exercise of lawful power, and appropriate to it, in seasons of exigency, which would be inappropriate at other times." See *American Land Co.* v. *Zeiss,* 219 U. S. 47, 60; *Wilson* v. *New,* 243 U. S. 332, 347, 348; *Bowditch* v. *Boston,* 101 U. S. 16, 18, 19; *Edmonson* v. *Ferguson,* 11 Missouri, 344, 346; *Breitenbach* v. *Bush,* 44 Pa. St. 313, 318, 319; *Hoffman* v. *Charlestown Five Cents Savings Bank,* 231 Massachusetts, 324; Soldiers & Sailors Civil Relief Act, 40 Stat. 444, §§ 100, 103, 201, 302; *Weed & Co.* v. *Lockwood,* 266 Fed. Rep. 785, 788; c. 80, § 2, 41 Stat. 297. From time immemorial, a feeble tenantry have been protected from oppression during times of emergency or misfortune.

One of the inherent and fundamental purposes of all civilized government is to prevent extortion and oppression and to safeguard the public; and in the light of that principle all constitutions must, of course, be read. It was early realized that there were many callings and businesses to which the public necessarily had to resort and in which, therefore, they had an interest. If these were to be left undisturbed by the law, it was patent that they would in numerous instances have practically unlimited power to oppress the public. Accordingly,

government was called upon to protect the public from extortion, and both then and now callings and property charged with a public interest have been regulated by the State. What shall be so regulated depends entirely upon the peculiar economic and social conditions of the times. See c. I, Wyman's "Public Service Corporations."

It was not necessary that persons thus subjected to regulation should have a monopoly—though that element, if it existed, served to emphasize their capacity to do public harm at will; or that they should enjoy a special privilege or franchise—though that might serve to make clearer their duty to the public. *Munn* v. *Illinois*, 94 U. S. 113; *Budd* v. *New York*, 143 U. S. 517; *Brass* v. *Stoeser*, 153 U. S. 391; *German Alliance Insurance Co.* v. *Lewis*, 233 U. S. 389, 411.

The public interest which warrants the regulation of such ordinary, private, competitive and unfranchised businesses as grain elevating (*Munn* v. *Illinois*, and *Budd* v. *New York*, *supra*), fire insurance (*German Alliance Ins. Co.* v. *Lewis*, *supra*), laundrying (*Oklahoma Operating Co.* v. *Love*, 252 U. S. 331, 337–8) bread baking (*Mobile* v. *Yuille*, 3 Ala. N. S. 140; *Louisiana Bread Case*, 12 La. Ann. 432), etc., is incomparably smaller than that which underlies the exertion of the legislative power over the business of renting apartments and houses for dwelling purposes in densely populated cities like New York. The vital principles of government, it is submitted, have not become static or fallen into decadence, but, on the contrary, are still progressive and competent to deal practically with extortion, oppression and emergency wherever and whenever they appear.

From the earliest times the British Government has never hesitated either actually to fix prices when other means proved unavailing, or to require, in general terms, that vendors of necessaries shall sell them at reasonable

prices and moderate gains. Wages, herrings, clothes, poultry, candles, hats, beer, wine, butter, cheese, bread and numerous other commodities were thus from time to time regulated as necessity required. That the power to enact such laws passed to the several States has always been recognized. And it has never been held that such regulation in time of shortage and public emergency, in order to prevent widespread public oppression and suffering, unlawfully deprived an individual of his property, merely because it prevented him from reaping the gains of an extortionate and oppressive use of his own. The vivifying principle was always in the maxim, *Sic utere tuo ut alienum non lœdas.*

No one would now question the right of a State to fix the rate of interest; and it is no answer to assert that the usury laws furnish no analogy since they are in reality a relaxation of a prohibition of the common law against charging any interest at all. *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 409.

The usury laws are an illustration also of the right of the legislature to conclude that in certain relations it is in the great majority of cases impossible for the parties to deal at arms' length and with unimpaired freedom of will, and, consequently, of the right of the legislature in such instances to refuse force and effect to contracts so made or require them to be modified so as to conform to justice and fairness. *Holden* v. *Hardy,* 169 U. S. 366, 397.

The legislature certainly has the power to regulate and modify common-law and equitable defenses. *Arizona Employers' Liability Cases,* 250 U. S. 400, 421; *Van Dyke* v. *Wood,* 60 App. Div. 208, 212; *78th Street & Broadway Co.* v. *Rosenbaum,* 111 Misc. (N. Y.) 577; *American Coal Mining Co.* v. *Special Coal & Food Comm.,* 268 Fed. Rep. 563. American courts are constantly studying English history and English statutes in order to determine whether a particular exercise of legislative power is or

is not within the principle of due process of law, or is
er is not arbitrary and unduly oppressive. Numerous
and familiar instances will readily recur to the court.
See *Murray's Lessee* v. *Hoboken Land & Improvement Co.,*
18 How. 272, 276. In giving the preference to the tenant
in possession, the legislature merely legalized a long-
standing social custom and restraint evidenced in the Eng-
lish, Irish, Scotch, Hebrew, Maryland and New York prec-
edents, and thereby was enabled to protect its present
residents in their homes from competition by nonresidents.

The classification made in the statutes is justified
by the character and extent of the evil aimed at, and
obvious differences in subject-matter.

Chapter 944 is not invalid because it does not specifi-
cally define what shall constitute an unreasonable rent
and an oppressive agreement therefor; nor are its other
provisions unfair or unreasonable.

*Mr. Louis Marshall* and *Mr. Lewis M. Isaacs,* by leave
of court, filed a brief as *amici curiæ:*

It is safe to say that never before in the history of our
country has legislation of so revolutionary a character
been undertaken. Private property, devoted to pur-
poses essentially private, is sought to be taken out of
the control of the owner and to be placed in the posses-
sion and occupancy of another on terms, not in accord-
ance with the contract between them, but such as a court
or jury may fix. The legislature takes the property of
A and gives it to B for an indefinite period on terms which
A is unwilling to accept but which he is to be forced to
accept *nolens volens.* If the tenant refuses to pay the
stipulated rent, or if he holds over after the expiration
of his term, the landlord cannot regain possession, be-
cause, by these acts, he has been stripped of the right
to maintain a possessory action. Should he sue to re-
cover the rent stipulated by the contract, he is met by

the defense that the terms of the contract are unjust and unreasonable, and if the amount of the stipulated rent is greater than the rent paid for the use of the premises a year prior to the date of the agreement under which the rent is sought to be recovered, he is confronted by a statutory presumption that the rent sought to be recovered is unjust and oppressive. The burden of overcoming this presumption is imposed on him. In spite of the fact that there has been an express agreement, in contravention of the well-established rule that a contract will not be implied where the parties have entered into an express contract, he has the option of either going empty out of court, should he in the opinion of an interested jury be unable to overcome this presumption, or of being left to recover for use and occupation on a *quantum meruit* in lieu of the stipulated rent. He is compelled either to submit to the determination of the tenant or to incur the expense, the vicissitudes and the delay of litigation in an effort to enforce his contract.

The statute prescribes no standards by which the justice and reasonableness and freedom from oppression which must be established in order to warrant a recovery under the laws, are to be determined.

That such standards are necessary in order that there may be due process of law is illustrated by the decisions in *International Harvester Co.* v. *Kentucky,* 234 U. S. 216; *Collins* v. *Kentucky,* 234 U. S. 634, and *American Seeding Machine Co.* v. *Kentucky,* 236 U. S. 660. See also *United States* v. *Cohen Grocery Co.,* 255 U. S. 81.

In the provision relating to a bill of particulars the essential elements entering into the ascertainment of rental value are omitted.

The legislature by these acts leaves the determination of the complicated question of rental value at a time when all prices and values of the necessaries of life have risen, with the consequent and universal irritation re-

sulting therefrom, to a court or jury with respect to each case as it may arise, without providing guide or compass or defining a standard enforceable by the owner of the property as well as by the tenant. If it should appear that the agreed rental is less than it could be proven that it legitimately might have been, the tenant can only be required to pay the stipulated rental. If during the term of the lease the prevailing rental value of the property should be enhanced, the tenant could not be required to pay more than he agreed to pay. The fact that the lease runs for a term of years and that the vicissitudes incidental to our economic life may bring about a change of conditions and of values, are necessary elements in price or rental value. Yet, under this statute, the landlord is to bear all risks and the tenant is to be enabled at will to assert the obligation of the landlord's covenant or to deny the validity of his own.

The provision that a mere increase in the rent of demised premises over the rent as it existed one year prior to the agreement under which it is sought to be recovered, renders the contract presumptively unjust, unreasonable and oppressive, is arbitrary and unreasonable and offends against the due process clause.

The practical effect of such a provision necessarily would be to invalidate a lease which provided for an increased rental unless the landlord could, on a trial before a jury, overcome this presumption by proving a negative, namely, that the agreement was not unjust, unreasonable and oppressive. That would necessitate proof in justification of the terms of the contract, the giving of testimony as to what would be a fair return upon the property which was the subject of the lease. This in turn would give rise to proof as to a multitude of elements affecting the reasonableness of the rent. It might involve an issue as to each element of value. It might call for the giving of expert testimony by both sides; and the burden of

proof would rest on the landlord. And yet the court in a case involving the regulation of rates of a common carrier, (*New York Central R. R. Co.* v. *Public Service Commission,* 215 N. Y. 241,) declared that the burden of proof that an increase of rates was reasonable could not be cast on the railroad company, even where the rates are to be fixed by an impartial commission.

If the legislature may say to the owner of a building devoted to private purposes, that he shall not be permitted to enter into a contract for the leasing of his property except on condition that the contract shall run the gauntlet of the courts and juries and that the amount that he shall be permitted to charge shall eventually be fixed by a court or jury, then it is difficult to understand why the legislature may not say to the farmer or to the grocer that, irrespective of the contract price at which he may sell to a customer milk, potatoes, wheat, or any other of his products, the purchaser may contest the reasonableness of the price and be limited in his payment to the sum that a court or jury may eventually determine to be the just and reasonable price. There is not a business conceivable, however private it may be, that could not with equal right be made dependent upon the action of the legislature.

This statute deprives the landlord of his liberty of contract and of his property without due process of law.

What is true of the taking of property is equally true of the enjoyment of the incidents and attributes of property. In the case of real property, the rents, income and profits derivable from its holding are such attributes.

Liberty, it has been frequently held, includes the right to acquire property, and that means the right to make and enforce contracts in respect thereof.

There can be no doubt that the police power has long existed and that in recent years its scope has been somewhat extended. Nevertheless it is not superior, but sub-

ject to the Constitution. This should not for a moment be forgotten, if free government under our present system is to continue. *Matter of Jacobs,* 98 N. Y. 98, 108; *Slaughter-House Cases,* 16 Wall. 36, 87; *Adair* v. *United States,* 208 U. S. 161; *People* v. *Marcus,* 185 N. Y. 257; *Coppage* v. *Kansas,* 236 U. S. 1.

. We are met with the contention that the State has the right to fix the charges to be made by the owner of private property for its use, on the theory that the public welfare may be thereby promoted.

The plaintiff's property was not devoted to any public use. The various apartments constituted dwellings that were rented for private occupation to the several persons whom the owner was willing to accept as tenants. The general public had no concern with this property.

Innkeepers have from the earliest days been recognized as engaged in a public business. On the other hand, a boarding-house keeper is engaged in a private business; is, therefore, under no obligation to serve the public; is at liberty to choose his own guests, and to make special arrangements with them. Except so far as regulations relating to health and morals are concerned, he does not come within the regulatory power of the legislature.

Grist mills, also, are devoted to a public purpose. Their owners have enjoyed valuable privileges from the legislatures with respect to the erection of dams and the flowage of land.

So of the owners of bridges, ferries, and public grain elevators and warehouses, electric light plants, oil pipe lines, and other similar public utilities. The distinction between them and the owners of private property designed for private uses has been uniformly observed.

In *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389, the business sought to be regulated was that of fire insurance. That was shown to be a business that had been regulated for many years in all parts of the

country, carried on exclusively by corporations which derived their existence from the sovereign. Theirs was conceded to be a business affecting the public welfare.

There is nothing in *Oklahoma Operating Co.* v. *Love,* 252 U. S. 331, that will support this legislation. There was not even an intimation that the corporation commission was constitutionally empowered to establish rates for laundry work. The court decided that the plaintiff was entitled to a temporary injunction restraining the enforcement of the penalties prescribed by the statute, which in effect prevented judicial review.

This court has just declared the Lever Act unconstitutional. The decision rendered is the more noteworthy because it was enacted by Congress in the exercise of the war powers conferred by the Federal Constitution. No such powers are conferred on the New York legislature.

In *Terminal Taxicab Co.* v. *District of Columbia,* 241 U. S. 252, 256, it was held that, as to that portion of the business of the corporation which consisted mainly in furnishing automobiles from its central garage on orders by telephone, the regulation was not authorized.

In *Clark* v. *Nash,* 198 U. S. 361, there was no pretense that property could be taken without compensation. The sole question was as to whether the proposed taking came within the power of eminent domain. So of *Strickley* v. *Highland Boy Gold Mining Co.,* 200 U. S. 527.

*Schmidinger* v. *Chicago,* 226 U. S. 578, merely involved the question whether an ordinance, enacted under express legislative authority, fixing standard sizes of bread loaves, was valid. That was regarded merely as an exercise of the police power intended to prevent deceit, and practically of the same character as that of fixing weights and measures. *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342, which related to a special tax on trading stamps,

proceeded on the theory that their use was akin to lot-
teries and gaming.

The limitation of the power of the legislature to regu-
late the compensation of employment agencies was fully
considered in *Adams* v. *Tanner*, 244 U. S. 590. See
*Stell* v. *Mayor*, 95 N. J. L. 38, concerning directly the
rights of landlords.

*Collister* v. *Hayman*, 183 N. Y. 250; *Burnham* v. *Flynn*,
189 N. Y. 180, *Woollcott* v. *Shubert*, 217 N. Y. 212, and
*People* v. *Newman*, 109 Misc. (N. Y.) 622, held that a
theatre is not governed by the rules which relate to pub-
lic utilities and that the owners cannot be controlled as to
their rates, nor be compelled to admit the public gener-
ally, nor be prevented from arbitrarily excluding any
person whom they may see fit to exclude.

Many other cases might be cited as illustrating the
proposition that statutes undertaking to fix the prices
to be charged by private persons for services rendered
or property sold cannot be sustained. *Brazee* v. *Michigan*,
241 U. S. 340; *Adams* v. *Tanner*, 244 U. S. 590; *Holter
Hardware Co.* v. *Boyle*, 263 Fed. Rep. 134; *Fisher Co.* v.
*Woods*, 187 N. Y. 90; *Ex parte Dickey*, 144 California, 234;
*State* v. *Fire Creek Coal Co.*, 33 W. Va. 188.

Some of our opponents have indulged at some length
in citations from historians, decisions and statutes deal-
ing with conditions in European countries, as, e. g., in
Ireland and Scotland. They have also referred to alleged
*responsa* of rabbis rendered in mediæval times, in their
capacity as arbitrators. These passages from the history of
other countries, whose organic law differs fundamentally
from ours, have no application here, where our legislation is
necessarily governed by our written constitutions. Nor
are *responsa* rendered in the exercise of an ecclesiastical
as distinguished from a judical function by rabbis, who
were intent upon the avoidance of conflict among mem-
bers of the synagogue, of the slightest moment. The

very fact that the Jews, in the days when these arbitraments took place, could not own real property of itself indicates how far afield these alleged precedents are apt to lead one.

Nothing is clearer under our jurisprudence than that the legislature cannot carve out of existing estates, new estates, *in invitum*. It cannot confer on a tenant an equitable lien or charge against the owner's title, to take effect on the expiration of the tenancy. That would be confiscation, pure and simple. It would create the astounding doctrine, once a tenant, forever a tenant. What becomes of vested rights under such a theory? What becomes of property? The theory of a "tenant right" such as that sought to be imported into our land tenures by means of legislation has never gained a foothold here, and is foreign to our institutions as it is opposed to our constitutions. *Ives* v. *South Buffalo Ry. Co.*, 201 N. Y. 271, 287.

Assuming, but not conceding, that the taking of private property for housing purposes may be permitted for a public purpose, it can only be done upon making just compensation and in the manner provided by the Constitution.

The statute denies to the plaintiff the equal protection of the laws. There was no reasonable ground for excluding hotels, lodging houses, new buildings and buildings used for commercial, manufacturing or other business purposes; or for not extending the regulations to cities other than those included when like conditions were conceded to exist.

The act impairs the obligations of another contract. Prior to its passage the plaintiff and prospective tenants had entered into a lease at a fixed rental for a term of two years beginning October 1st, 1920. On September 27, 1920, the legislature declared this lease presumptively unjust, unreasonable and oppressive because it increased

the rent previously received by the plaintiff for these premises, and permitted the lessees to interpose this claim as a defense to any action that might be brought for the rent stipulated in the lease.

That this tends to nullify the contract between the parties and permits a court or jury to create a different contract from that which the parties agreed upon is self-evident.

The fact that the act under review recites that it is based on the existence of a public emergency does not validate it, if its provisions are violative of the Constitution.

Not only do the statements contained in the report of the Legislative Committee and in the message of the Governor, relied upon in support of this legislation, fail to justify it, but in most material respects they are contrary to the facts, and the theories therein propounded if pursued would inevitably aggravate the dearth of housing accommodations to which attention is directed.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a bill in equity brought by the Marcus Brown Holding Company, the appellant, owner of a large apartment house in the City of New York, against the tenants of an apartment in the house and the District Attorney of the County of New York. The tenants are holding over after their lease has expired, which it did on September 30, 1920, claiming the right to do so under cc. 942 and 947 of the laws of New York of 1920. The object of the bill is to have these and other connected laws declared unconstitutional. The District Attorney is joined in order to prevent his enforcing by criminal proceedings cc. 131 and 951 of the acts of the same year, which make it a misdemeanor for the lessor or any agent

or janitor intentionally to fail to furnish such water, heat, light, elevator, telephone, or other service as may be required by the terms of the lease and necessary to the proper or customary use of the building. The case was heard in the District Court by three judges upon the bill, answer, affidavits and some public documents, all of which may be summed up in a few words. The bill alleges at length the rights given to a lessor by the common law and statutes of New York before the enactment of the statutes relied upon by the tenants, a covenant by the latter to surrender possession at the termination of their lease, and due demand, and claims protection under Article I, § 10 and the Fourteenth Amendment of the Constitution of the United States. An affidavit alleges that before the passage of the new statutes another lease of the premises had been made, to go into effect on October 1, 1920. The answer of the tenants relies upon the new statutes and alleges a willingness to pay a reasonable rent and any reasonable increase as the same may be determined by a court of competent jurisdiction. It also alleges that they made efforts to obtain another suitable apartment but failed. The District Attorney moved to dismiss the bill. The judges considered the case upon the merits, upheld the laws and ordered the bill to be dismissed.

By the above mentioned cc. 942 and 947, a public emergency is declared to exist and it is provided by c. 947 that no action "shall be maintainable to recover possession of real property in a city of a population of one million or more or in a city in a county adjoining such city, occupied for dwelling purposes, except an action to recover such possession upon the ground that the person is holding over and is objectionable, . . . or an action where the owner of record of the building, being a natural person, seeks in good faith to recover possession of the same or a room or rooms therein for the im-

mediate and personal occupancy by himself and his family as a dwelling; or an action to recover premises for the purpose of demolishing the same with the intention of constructing a new building. . . ." The earlier c. 942 is similar with some further details. Both acts are to be in effect only until November 1, 1922. It is unnecessary to state the provisions of c. 944 for disputes as to what is a reasonable rent. They are dealt with in the decisions of the Court of Appeals cited below and in *Edgar A. Levy Leasing Co., Inc.* v. *Siegel*, 230 N. Y. 634, by the same Court. In this as in the previous case of *Block* v. *Hirsh, ante,* 135, we shall assume in accordance with the statutes, the finding of the Court below and of the Court of Appeals of the State, in *People ex rel. Durham Realty Corporation* v. *La Fetra*, 230 N. Y. 429, and *Guttag* v. *Shatzkin*, 230 N. Y. 647, that the emergency declared exists. *Hebe Co.* v. *Shaw*, 248 U. S. 297, 303. *Hairston* v. *Danville & Western Ry. Co.*, 208 U. S. 598, 607.

The chief objections to these acts have been dealt with in *Block* v. *Hirsh.* In the present case more emphasis is laid upon the impairment of the obligation of the contract of the lessees to surrender possession and of the new lease which was to have gone into effect upon October 1, last year. But contracts are made subject to this exercise of the power of the State when otherwise justified, as we have held this to be. *Manigault* v. *Springs*, 199 U. S. 473, 480. *Louisville & Nashville R. R. Co.* v. *Mottley*, 219 U. S. 467, 482. *Chicago & Alton R. R. Co.* v. *Tranbarger*, 238 U. S. 67, 76, 77. *Union Dry Goods Co.* v. *Georgia Public Service Corporation*, 248 U. S. 372, 375. *Producers Transportation Co.* v. *Railroad Commission of California*, 251 U. S. 228, 232. It is said too that the laws are discriminating, in respect of the cities affected and the character of the buildings, the laws not extending to buildings occupied for business purposes, hotel property or buildings now in course of erection, &c.

170.    McKenna, J., White, Ch. J., and others, dissenting.

But as the evil to be met was a very pressing want of shelter in certain crowded centers the classification was too obviously justified to need explanation, beyond repeating what was said below as to new buildings, that the unknown cost of completing them and the need to encourage such structures sufficiently explain the last item on the excepted list.

It is objected finally that c. 951, above stated, in so far as it required active services to be rendered to the tenants, is void on the rather singular ground that it infringes the Thirteenth Amendment. It is true that the traditions of our law are opposed to compelling a man to perform strictly personal services against his will even when he has contracted to render them. But the services in question although involving some activities are so far from personal that they constitute the universal and necessary incidents of modern apartment houses. They are analogous to the services that in the old law might issue out of or be attached to land. We perceive no additional difficulties in this statute, if applicable as assumed. The whole case was well discussed below and we are of opinion that the decree should be affirmed.

*Decree affirmed.*

Mr. Justice McKenna, The Chief Justice, Mr. Justice Van Devanter and Mr. Justice McReynolds, dissenting:

This case was submitted with *Block* v. *Hirsh,* No. 640, *ante,* 135.

Like that case it involves the right of a lessee of property—in this case an apartment in an apartment house in New York City—to retain possession of it under a law of New York after the expiration of the lease. This case is an emphasis of the other, and the argument in that applies to this. It may be more directly applica-

200 OCTOBER TERM, 1920.

McKENNA, J., WHITE, Ch. J., and others, dissenting. 256 U. S.

ble; for in this case the police power of the State is the especial invocation and the court's judgment is a concession to it, and, as we understand the opinion, in broader and less hesitating declaration of the extent and potency of that power. "More emphasis," it is said, "is laid upon the impairment of the obligation of the contract" than in the *Hirsh Case.* In measurement of this as a reliance, it is said, "But contracts are made subject to this exercise of the power of the State *when otherwise justified, as we have held this to be.*" The italics are ours and we estimate them by the cases that are cited in their explanation and support. We are not disposed to a review of the cases. We leave them in reference, as the opinion does, with the comment that our deduction from them is not that of the opinion. There is not a line in any of them that declares that the explicit and definite covenants of private individuals engaged in a private and personal matter are subject to impairment by a state law, and we submit, as we argued in the *Hirsh Case,* that if the State have such power—if its power is superior to Article I, § 10, and the Fourteenth Amendment, it is superior to every other limitation upon every power expressed in the Constitution of the United States, commits rights of property to a State's unrestrained conceptions of its interests, and any question of them— remedy against them—is left in such obscurity as to be a denial of both. There is a concession of limitation but no definition of it, and the reasoning of the opinion, as we understand it, and its implications and its incident, establish practically unlimited power.

We are not disposed to enlarge further upon the case or attempt to reconcile the explicit declaration of the Constitution against the power of the State to impair the obligations of a contract or, under any pretense, to disregard the declaration. It is safer, saner, and more consonant with constitutional preëminence and its pur-

poses to regard the declaration of the Constitution as paramount, and not to weaken it by refined dialectics, or bend it to some impulse or emergency "because of some accident of immediate overwhelming interest which appeals to the feeling, and distorts the judgment." *Northern Securities Co.* v. *United States,* 193 U. S. 197, 400.

We therefore dissent.