In the Matter of NEW YORK UNIVERSITY, Petitioner, against JOSEPH D. McGOLDRICK, as State Rent Administrator, et al., Respondents.

Supreme Court, Special Term, New York County, March 30, 1954.

*John Gerdes, W. Randolph Montgomery* and *Malcolm Monroe* for petitioner.

*Robert H. Schaffer* and *Beatrice Shainswit* for Joseph D. McGoldrick, respondent.

HOFSTADTER, J. In this proceeding under article 78 of the Civil Practice Act, the petitioner, New York University, seeks the annullment of an order of the State Rent Administrator, which vacated certificates of eviction theretofore issued by the local rent administrator.

The petitioner is the owner of two "old-law tenements" situated at 548 and 550 First Avenue, in the borough of Manhattan, a little south of the former East 32d Street. These premises are part of a site consisting of four square blocks on the east side of First Avenue between 30th and 34th Streets, assembled by the petitioner in 1948, for its New York University Bellevue Medical Center. Each of the two buildings contains sixteen apartments, four to a floor, from the second through the fifth floors. There are only two toilets on each floor, a condition which is in violation of section 250 of the Multiple Dwelling Law when more than eight families occupy apartments in each of the buildings. So long, however, as occupancy is limited to eight families in each of the two buildings, thus affording separate toilet facilities for each family, the requirements of this section of the Multiple Dwelling Law are satisfied. When the petitioner initially applied for the eviction certificates, more than sixteen tenants occupied the buildings, so that the toilet facilities were then inadequate, and the department of housing and buildings had given notice of this violation. Admittedly the installation of toilet facilities for the sixteen apartments in each building would entail a substantial expenditure. In this situation the petitioner in September, 1952, made an agreement with the department of housing and buildings pursuant to subdivision 7 of section 304 of the Multiple Dwelling Law, whereby the petitioner agreed to take the appropriate proceedings to vacate the buildings and the department in turn agreed not to press the violations, so long as the petitioner in good faith prosecuted its remedies for the eviction of the tenants in possession. The petitioner thereupon made application to the rent commission for certificates of eviction against the various tenants, which culminated in the order now under attack. The petitioner admitted before the commission that but for these violations it would not have sought possession of the buildings until two years after it applied for the eviction certificates.

Eventually the two buildings with which we are here concerned are to be demolished and the land on which they stand form part of the general landscape for the entrance to the medical center. The demolition is, however, not immediately in prospect. As yet no specific date has been set, no contract has been entered into, nor has the petitioner sought a demolition permit. The petitioner has stated that if it succeeds in obtaining possession of the houses, it may until they are torn down "if circumstances so require" use them for the storage of supplies and equipment.

Since the petitioner first applied for the eviction certificates, the situation has changed in one critical aspect. Through voluntary removals the number of tenants in the buildings has been reduced to sixteen, as a result the toilet facilities are now adequate for the remaining tenants, and the violations mentioned no longer exist. Despite this change in circumstances the petitioner persists in its demand for possession and challenges the State Rent Administrator's refusal of the eviction certificates.

The record discloses that with sixteen tenants in the two buildings paying their present rentals, the petitioner incurs an annual operational deficit of $367.90. It is said for the petitioner that there has been a further reduction in occupancy below sixteen tenants and that the deficit will be correspondingly greater. The petitioner argues that, since it is an educational institution organized on a nonprofit basis, the loss from the continued occupancy of the buildings is an unwarranted subsidization of the tenants and a diversion of its funds dedicated to educational and hospital purposes. It insists here that it has the absolute present right to withdraw the properties from the rental market. This contention necessarily leads to a study of the applicable provisions of the State Residential Rent Law and the regulations thereunder. Subdivision 4 of section 10 of the Law provides: " *Prohibitions* * * * 4. Nothing in this act shall be construed to require any person to offer any housing accommodations for rent, but housing accommodations already on the rental market may be withdrawn only after prior written approval of the state rent commission, if such withdrawal requires that a tenant be evicted from such accommodations." (L. 1951, ch. 443.)

Section 54 of the State Rent and Eviction Regulations issued pursuant to the law provides generally that, with exceptions not here material, no tenant shall be removed or evicted unless on the landlord's application the Administrator issues a certificate permitting the landlord to pursue his remedies at law.

Section 59 of the State Rent and Eviction Regulations reads: " A certificate shall be issued where the landlord establishes that he seeks in good faith to permanently withdraw occupied housing accommodations from both the housing and non-housing rental markets without any intent to rent or sell the housing accommodations. No certificate shall be issued under this section unless the landlord establishes that he seeks to recover possession of the housing accommodations because of an immediate

and compelling necessity and exceptional circumstances and the continued operation of the housing accommodations by the landlord will impose undue hardship on him, or where the granting of the certificate is inconsistent with the purposes of the Act.''

The following portion of section 54 of the regulations also bears on the present problem: '' 1. The Administrator may also issue orders granting certificates in other cases if the requested removal or eviction is not inconsistent with the purposes of the Act or these Regulations and would not be likely to result in the circumvention or evasion thereof.''

In making the order here under review the State Rent Administrator wrote a comprehensive opinion.  He found that '' no further expenditures or outlay of moneys was necessary to permit the tenants to continue to occupy their apartments until needed '' for the medical center and that the only basis which could still be asserted for the eviction certificates was the operating loss which would be sustained until the petitioner actually required the buildings.  The Administrator expressed the view that in times of acute housing shortage the privilege of occupying the accommodations here in question even for a few months is a substantial right not to be lightly dealt with. To meet the exigency in a practical way the Administrator sought the petitioner's consent to the extension of the stay in the certificates theretofore issued by the local administrator beyond the period permissible, in the absence of consent, but the petitioner, standing on what it conceived to be its rights, withheld consent.  The Administrator accordingly revoked the eviction certificates.

The foregoing determination of the Administrator was, in my opinion, fully justified by the quoted regulations.  The time for demolition being still indefinite, surely there was neither immediate nor compelling necessity.  The comparatively small operating loss in the interval — even assuming the loss could not be averted by economies or by increased rentals, if found proper and granted by the rent commission — does not impose undue hardship on the petitioner. As pointed out in the Administrator's opinion, some operational loss is almost inevitable in any withdrawal of housing accommodations from the rental market.  I, therefore, hold that the Administrator's order was within the discretion lodged in him by the regulations and was neither arbitrary nor capricious.

This brings us to the more basic contentions of the petitioner. It argues that subdivision 4 of section 10 of the State Residential

Rent Law entitles it to eviction certificates, whether or not the conditions prescribed in section 59 of the regulations for the issuance of such certificates exist. The petitioner's position is, in effect, that the statute gives it the absolute right to withdraw the properties from the rental market and that, insofar as the regulations limit that right, they go beyond the statute and, as a result, are invalid. This contention rests on a misreading of the statute. The very requirement in the statute of the rent commission's approval before housing accommodations may be withdrawn from the rental market negatives an unqualified right of withdrawal. A clear and simple declaration would more aptly have expressed a legislative purpose to give the unlimited right of withdrawal for which the petitioner contends. As applied to the situation here, the regulations are not inconsistent with the statute and to that extent have been validated by the Legislature (L. 1951, ch. 443, § 2).

Nothing decided in *Matter of New York Univ.* v. *Temporary State Housing Rent Comm.* (304 N. Y. 124), leads to a different conclusion. It was not held in that case, as the petitioner argues now, that subdivision 4 of section 10 of the statute reserves to an owner the unqualified right to withdraw his housing accommodations from the rental market. Implicit in the opinion was a recognition of the validity of section 59 of the regulations. The ruling was that the regulation did not authorize the imposition by the rent commission of the condition that the petitioner relocate the tenants. Accordingly the court said: (p. 130) " But, for present purposes, we can content ourselves with holding that, even assuming the validity of the whole of section 59, petitioner did show hardship and compelling necessity by its undisputed proof that it needs these buildings for its own University purposes, and that without them its educational program will be seriously interfered with." There was no question in that case, as there is here, of the need of immediate possession for the petitioner's own educational purposes.

Our emergency legislation differs from the Federal statutes invoked by the petitioner. The Housing and Rent Act of 1949 (U. S. Code, Appendix, tit. 50, § 1903, 63 Stat. 29, § 301) declared broadly, as did its predecessors, the Emergency Price Control Act of 1942 (U. S. Code, Appendix, tit. 50, § 904, subd. [d], 56 Stat. 28) and the Housing and Rent Act of 1948 (U. S. Code, Appendix, tit. 50, § 1903, 62 Stat. 99) : " Nothing in this act or in the Housing and Rent Act of 1947, as amended, shall be construed to require any person to offer any housing accommodations for

rent." The right to withhold housing property from the rental market is thus not conditioned on prior administrative approval, as under our State Residential Rent Law. The distinction between the two statutes is basic and renders inapplicable the decisions under the Federal acts on which the petitioner relies. I cannot adopt the petitioner's contention that the grant of the more restricted right of withdrawal in the State Residential Rent Law merely codifies the practice under the Federal act and that a landlord is entitled, as of right, to an eviction certificate on proof of an actual intent to withdraw his property from the market, irrespective of the circumstances of the threatened withdrawal.

The petitioner urges that if the Administrator's determination here under attack is permitted by the State Residential Rent Law and the regulations, it deprives the petitioner of its property without due process of law, in violation of section 6 of article I, of the Constitution of the State of New York and of the Fourteenth Amendment to the Constitution of the United States.

The acute housing shortage which gave rise to the emergency legislation is a matter of common knowledge. Since housing is a prime necessity of organized society, the emergency vitally and directly affects the public health and well-being. In such circumstances, the State properly resorts to the police power and private right must yield to the greater public need. The statutory protection of tenants in the continued possession of their homes during a housing shortage as an appropriate and effective means of counteracting the evils attendant on the shortage, has long been upheld as constitutional (*People ex rel. Durham Realty Corp.* v. *La Fetra,* 230 N. Y. 429; *Block* v. *Hirsh,* 256 U. S. 135; *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170; *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242). Nor is it essential to the validity of such legislation that the right to withdraw the property from the rental market be reserved to the owner (*Loab Estates* v. *Druhe,* 300 N. Y. 176); and the right of withdrawal may be granted with limitations fashioned to safeguard the underlying purpose of the legislation (*Suppus* v. *Bradley,* 278 App. Div. 337; see, also, *Matter of Emray Realty Corp.* v. *McGoldrick,* N. Y. L. J., Nov. 25, 1953, p. 1225, col. 2).

If complete justice is not always done in landlord-tenant cases, it is because it is not possible to do so in all circumstances. Though the law does not formally so phrase it, what we have to decide frequently, in reality, is whether greater hardship would be inflicted on the tenant by turning him out, or on the landlord

by keeping his property from him, temporarily. That is the imponderable. The landlord cannot at all times have his property to do with as he chooses; for it would not be altogether just to punish blameless people for living in a time and place where there is no room for them.

Finally: the petitioner's argument that it is being compelled to run the buildings at an out-of-pocket loss and that this compulsion is an unlawful taking of its property, is not sustained. It has not been established that, if the petitioner made reasonable efforts to rent the recently vacated apartments, it could not again bring the number of occupied apartments to sixteen and thereby reduce the annual operating loss to the trivial sum of $367.90. Nor is it shown that even such loss cannot be overcome through more economic management or the available remedies to secure rent increases. But even if the petitioner were subjected to an insignificant loss during the emergency, its constitutional rights are not violated. For, as the court said in *Teeval Co.* v. *Stern* (301 N. Y. 346, 362): "The State rent control statute was enacted to meet a passing emergency. It does not contemplate a taking of the property of any landlord. Even though it may, now and then, compel an owner to operate his real property at a loss, the statute is not for that reason to be condemned as an arbitrary use of the police power (*Bowles* v. *Willingham*, 321 U. S. 503, 516-519)."

I conclude, therefore, that the petitioner has not been deprived of its property in defiance of the Constitution. For, as we have seen, in the emergency the individual may not press his right to a point where it thwarts the superior requirements of the common need; at that point he must give ground in the interest of all. Establishing a working balance between the interests of the individual and the demands of the general welfare is never a simple task. Indeed, it may require self-imposed restraints. It was Lord MOULTON who first articulated the concept that "the real greatness of a nation — its true civilization — was measured by the extent of this law of obedience to the ' unenforcible ' ". And I am confident that, on reflection, the petitioner, as a great center of philanthropy as well as of learning, would not, even if it could, insist on immunity from a sacrifice, if such it be, which every citizen must bear.

The application is denied and the proceeding is dismissed.