## LINGO LUMBER CO. v. HAYES.

### No. 11585.

Court of Civil Appeals of Texas. Dallas.

Oct. 21, 1933.

John C. Read and Earl A. Forsythe, both of Dallas, for appellant.

R. L. H. Rice, of Dallas, for appellee.

JONES, Chief Justice.

This is an appeal by the Lingo Lumber Company, a corporation, appellant, from the granting of a temporary writ of injunction in favor of W. J. Hayes, appellee, restraining appellant from selling certain described real estate, located in the city of Dallas, under the provisions of a deed of trust authorizing the trustee named therein to sell such land, in case of default in the payment of the debt it secured, and to apply the proceeds to payment of the indebtedness. The indebtedness secured by the deed of trust was assumed by appellee as a part of the consideration for the purchase price of the real estate by appellee. The land on which the lien exists is residential property, and is occupied by appellee as his homestead. The temporary writ of injunction was granted under the provisions of section 3 of chapter 102 of the Acts of the Forty-Third Legislature (Vernon's Ann. Civ. St. art. 2218b), which became effective May 1, 1933. This enactment is commonly known as the "Mortgage Moratorium Law." The following are the necessary facts:

Appellee's petition was filed on May 30, 1933, in the district court for the Ninety-Fifth judicial district in Dallas county, and by appropriate allegations shows that he purchased the land for a consideration of $3,250, $200 of which was paid in cash, $2,250 by the assumption of one note in the principal sum of $2,250, which is the note involved, and the remainder of the consideration by the execution of a vendor's lien note in the principal sum of $800 to B. A. Eubanks to be paid, in monthly installments of $32, to be applied (1) to the payment of interest on the first lien note; (2) to the payment of interest on the second lien note; and (3) the remainder to the discharge of principal of the $800 second lien note. All taxes were paid up to and including 1932, and the interest paid on the first lien note up to and including February 1, 1933, when appellee defaulted in the monthly installments, and has been unable to pay any sum since said date. This default was caused by appellee's loss of employment and his inability to secure other employment. The petition is verified, and complies with all of the conditions made in section 1 of said law, as a prerequisite to the issuance of the temporary writ of injunction. A temporary restraining order was issued, without a hearing, on June 1, 1933. Appellant was duly notified to appear in court on June 10, 1933, and show cause why said restraining order should not be continued in force as a temporary writ of injunction. On said date appellant appeared in court and filed his original answer and motion to dissolve the restraining order. The ground of defense against the issuance of a temporary writ of injunction was that said legislative act is unconstitutional and void; this defense was not allowed by the trial court, and a temporary injunction was ordered to be issued, restraining the sale of the property, for a period of time not beyond May 1, 1934, conditioned that appellee file a bond, in the sum of $300, conditioned as required by law. This bond was filed, approved by the clerk of the court, and the temporary injunction was issued.

Appellant duly perfected an appeal, and, in a very able and elaborate brief, urges that said enactment is unconstitutional, because prohibited by the provisions of section 10 of article 1 of the Federal Constitution, which declares that "no State shall * * * pass any * * * ex post facto Law, or Law impairing the Obligation of Contracts"; that said enactment is also prohibited under section 16 of art. 1 of the state Constitution, which declares that "no bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." The primary question at issue is the constitutionality of this law, the salient features of which are:

Section 1 of the enactment in question (Vernon's Ann. Civ. St. art. 2218b, § 1) provides that: "* * * In all suits or causes of actions which may be filed within one hundred and eighty (180) days from and after the effective date of this Act and in which a judgment for the recovery of real property sought to be recovered, or wherein a recovery of real property is sought for a failure or omission to pay any indebtedness due thereon, or to foreclose any lien or liens thereon, the defendant shall have the right to a postponement or continuance thereof as herein provided and a stay of orders of sales or executions by complying with the conditions as hereinafter set forth * * *."

This section also provides that the defendant, against whom a foreclosure is sought, shall file a sworn statement showing:

"(a) That the defendant is unable to pay said indebtedness and that the property of the defendant, if sold under an order of sale, or any other property of the defendant, if sold under execution, would probably sell for less than its reasonable market value, and/or less than its intrinsic value.

"(1a) That the lien sought to be foreclosed was not procured or obtained for the purpose of securing in part or whole any indebtedness for money or property procured by misrepresentation, fraud, defalcation or embezzlement.

"(b) That the rendition of a judgment as prayed for by plaintiff and the sale of the defendant's property under deed of trust or execution or order of sale would result in an unfair, unjust and inequitable financial injury to the defendant.

"(c) That the property upon which the lien is sought to be foreclosed is not being wasted, illtreated, mismanaged or destroyed and is in

substantially as good condition as when the lien was first executed, and that the defendant has not, with the intent to defeat or delay the collection of the indebtedness or the enforcement of the lien, dissipated the property or the rents and revenue theretofore derived therefrom.

"(d) That the defendant is not in arrears in the payment of taxes for more than four (4) years since February 1, 1922, on the property involved in the suit.

"(e) That the defendant consent either to the appointment by the Judge or the Court of a disinterested party to collect all rents and revenues, derived from the property upon which the lien exists, during the period of postponement or continuance or stay of orders of sales or executions and to apply the same as a credit on the indebtedness, or deposit the same in the registry of the Court to await the final disposition of the case or to use, apply or dispose of the rents as the Judge may direct without the appointment of a disinterested party to collect the same."

Section 1 also provides for a hearing by the court of evidence in support of or against the facts required to be alleged, in order to secure the benefit of the act, and, if they appear to be probably true, it is made mandatory on the court to defer rendering judgment in the cause for as long a period as 180 days, and provides that no order of sale or execution shall issue until after the expiration of the time fixed by the court. It also provides that, after the expiration of the 180 days, but not later than the expiration of 200 days, the court can grant a further extension of time, upon a showing that there is a continuance of the same conditions. In no event can a stay order continue longer than May 1, 1934.

If the property on which the lien exists be occupied by the owner, the act requires the court to fix its monthly rental value, and, during the time a stay order is in force, to require the owner to pay this rental value, either into the registry of the court, or to some person designated by the court to receive and hold same, subject to the further order of the court. If the property be income-bearing, the income is to be similarly paid and held. In the instant case, the court fixed the rental value of the property at $8 per month, and appellee is required to pay such sum monthly to the person designated as receiver, to hold same for the further order of the court.

Section 9 of the act (Vernon's Ann. Civ. St. art. 2218b, § 9) reads: "This Act shall have no effect upon any suit or cause of action based upon or seeking to enforce a contract or contracts entered into or obligations executed or assumed subsequent to the effective date of this Act, even though such contracts or obligations be in renewal or extension of, or otherwise relate to contracts or obligations executed or assumed prior to the effective date of this Act."

What are the respective rights of the lien creditor and the debtor against whose property the lien exists, under this act? The debtor, against whom a foreclosure suit has been filed, has the right, under the conditions named in the act, of a postponement of the issuance of an order of sale, or the issuance of an execution for a period of time not extending beyond May 1, 1934, at which time the law, by its own terms, ceases to exist. In cases where the creditor, whose debt is secured by a deed of trust with a power of sale, elects to have the incumbered property sold under such power of sale, the debtor has the right to go into a court of equity, and, on filing the required petition, cause to be issued a temporary writ of injunction, restraining the execution of the power of sale for a period of time not beyond May 1, 1934. It thus appears that, in any suit instituted by a lien creditor, or in any attempt of such creditor to subject the property to a trustee's sale under a power of sale in a deed of trust, the postponements and stay orders must necessarily be less than twelve months. A lien creditor, as we have seen, is required to postpone, for a period of time less than twelve months, the execution of the contract remedy, but is made secure against the dissipation of the income from rent-producing property, and for reasonable rent from homestead property.

Section 12 is the emergency clause, and declares that the enactment is based on the fact that "an extraordinary financial emergency and depression exists within this State and elsewhere, and that many citizens are threatened with destructive suits for the recovery of money and to the foreclosure of liens upon property and that it is difficult to secure supersedeas bonds, and by reason thereof imminent danger exists whereby citizens may be subjected to distressing losses, and because thereof such suits or proceedings as provided in this Act should be permitted to be stayed or continued. * * *"

■ The remedy for the enforcement of a contract obligation to pay money is the procedure prescribed by the Legislature to secure such payment. If the contract to pay a given sum of money at a given time is secured by a valid mortgage on the property of the debtor, the procedure prescribed by the Legislature in this state is that of the filing of a suit in a proper court, to establish the debt and the lien, to foreclose the lien and subject the incumbered property to payment of the debt, through the timely issuance of an order of sale. All court procedure, however, is subject to legislative change, and every contract made is necessarily entered into with the knowledge that the Legislature may change the procedure

relative to the remedy for the enforcement of such a contract, and, while the remedy, existing at the time the contract is executed, is impliedly written therein, yet it is generally held that, if the Legislature subsequently changes the remedy, the new remedy will apply, provided it is as adequate for the purpose of enforcement as the previous remedy, even though the remedy may be attended with more delay than was incident to the former one, provided there remains to the creditor a substantial means of enforcement of the contract, within a reasonable time. Memphis, etc., R. Co. v. Tennessee, 101 U. S. 337, 25 L. Ed. 960. The general rule in this respect is aptly stated by 6 R. C. L. p. 360, § 355, as follows: "While it is conceded that a distinction exists between alterations of the remedy which are deemed to be legitimate and those which, under the form of modifying the remedy, impair substantial rights, generally speaking, the difficulties in the way of stating a rule render it imperative that every case be determined on its own particular circumstances; and the question whether a change of remedy impairs a substantial right in the last analysis is ordinarily one as to reasonableness. A test frequently advanced is that only such repeals or changes of any of the remedies existing as to the enforcement of a contract as serve to lessen the value of the agreement, or which substantially interfere with, or abridge, obstruct or unreasonably delay rights thereunder, impair the obligation." See authorities cited in notes under the text.

On all contracts to which the act under consideration applies, the law, as it existed previous to this act, provided a speedy means of enforcement. For such speedy means of enforcement this act has substituted a delay of several months, and we are inclined to the opinion that, when considered independent of the emergency which caused its enactment, cannot be justified on the ground that such substitution for the existing remedy only results in a reasonable delay, and therefore not subject to the inhibitions placed in the above-quoted provisions of the Federal and state Constitutions. Dallas County Levee Improvement Dist. No. 6 v. Rugel (Tex. Com. App.) 36 S.W.(2d) 188; International B. & L. Ass'n v. Hardy, 86 Tex. 610, 26 S. W. 497, 24 L. R. A. 284, 40 Am. St. Rep. 870; McCracken v. Hayward, 43 U. S. (2 How.) 608, 11 L. Ed. 397; Edwards v. Kearzey, 96 U. S. 595, 24 L. Ed. 793; Luter v. Hunter, 30 Tex. 689, 98 Am. Dec. 494; Louisiana v. New Orleans, 102 U. S. 203, 26 L. Ed. 132.

The fact that this legislative act may impair to a certain degree the obligation of contracts is not conclusive against its validity; for, as will appear from decisions hereafter cited, conditions may exist under which the public welfare demands the yielding for a time of private rights to the general public good.

Certainly no one could contend that, if there should be ushered in upon this nation such a chaotic condition which endangers the life of our institutions, and under the operation of which our entire economic structure is falling, and our system of credit is collapsing, it would not become the duty of our national and state Legislatures to meet such a condition promptly with emergency legislation, designed to stay such threatened destruction and to place our institutions, our economic structure, and our system of credit again on firm foundations. However, neither the Congress of the United States nor the Legislature of a state can pass a legislative act, even under such an emergency, and for so high a purpose, unless such legislation be in conformity with the fundamental laws of the state and nation; or, in other words, unless such legislation be the lawful exercise of legitimate governmental powers. Many years ago, the Supreme Court of the United States declared in the Legal Tender Cases, 12 Wall. 457, 551, 20 L. Ed. 287, 312 that the provision of the Federal Constitution that no state shall pass any law impairing the obligation of contracts puts no limit on any lawful exercise of legitimate governmental powers. This construction of such provision in the fundamental law of the nation is both wholesome and necessary. Without such construction, the power might not exist, in the stress of a great emergency, to require the yielding, for a time, of private contract rights, in order to make secure the general welfare of the people.

The power resting in a legislative body to enact laws, designed to meet such an emergency, as above described, is known as the police power, and it is inherent in every government. The term is incapable of exact definition or limitation, because no one can foresee the everchanging conditions which may call for its exercise. It is invoked in legislation, designed to protect public health, public morals, and public safety; or, in other words, the public welfare, which broad term includes the other and more specific terms. It is this inherent power that warrants legislation in the stress of a great emergency. "Hence it is that not all legislation which has the effect of impairing a contract is obnoxious to the constitutional prohibition as to impairment. * * * The authority of the legislature, in the exercise of its police powers, cannot be limited or restricted by the provisions of contracts between individuals or corporations, or between individuals and municipal corporations." 6 R. C. L. p. 199, § 195, and see authorities cited in notes to this section. The police power has been frequently described

as the law of necessity; one of the principles involved in police power is expressed by the well-known maxim, "salus populi suprema lex est" (the welfare of the people is the supreme law). 6 R. C. L. p. 188, § 187.

Sligh v. Kirkwood, 237 U. S. 52, 35 S. Ct. 501, 502, 59 L. Ed. 835, declares that the police power "is not subject to definite limitations, but is co-extensive with the necessities of the case and the safeguards of public interest. * * * It embraces regulations designed to promote public convenience or the general prosperity or welfare, as well as those specifically intended to promote the public * * * health." That emergency legislation, under the police power of the state, may impair to a reasonable extent contract obligations, and yet be the lawful exercise of legitimate governmental power, is clearly held in those cases known as the "Housing Cases," in New York and in the District of Columbia. The occasion for the emergency legislation dealt with in those cases, and the extent to which such legislation may lawfully impair the obligations of a contract, is so similar in all respects to the questions here involved that we consider said cases as conclusive of such question. Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Marcus-Brown Co. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877; People ex rel. Durham Realty Corp. v. La Fetra, 230 N. Y. 429, 130 N. E. 601, 16 A. L. R. 152.

To meet an immediate emergency, resulting from the scarcity of houses in the District of Columbia, Congress enacted a law to permit a tenant to hold over, for a limited and definite period of time, notwithstanding the expiration of his lease, and notwithstanding that he had contracted with the landlord to surrender the building on the expiration of the lease term. The two Supreme Court cases, above cited, sustained the constitutionality of this law. Under the existence of the same character of an emergency, the Legislature of the state of New York enacted a very similar law, and its constitutionality was sustained by the highest court of the state of New York, in the New York case above cited. Necessarily, there was involved the same rule of law in those cases in respect to the legislative right, under the existing conditions, to impair the obligation of a contract, as is involved in the instant case. In the reported cases, the contract right of the landlord to compel his tenant immediately to surrender possession of the premises, at the expiration of his lease, was impaired, to the extent that the landlord was stayed by the emergency law from the assertion of his contract right for a time which the court deemed to be reasonable.

To what extent does this emergency law deprive a mortgagee of a right he had secured by private contract with his debtor? The obligation of his debt is left unimpaired. His contract lien and the property securing it likewise are left unimpaired. His ultimate remedy of subjecting the mortgage property to payment of his debt remains. There is, however, a stay, beyond the contract time, of the exercise of the remedy to subject the mortgaged property to a sale, in order that the proceeds may be applied to the debt; in no event can the time be extended beyond May 1, 1934. At the expiration of such stay, the mortgagee is again clothed with all of the contract right as to the remedy. During the time of the stay, this law gives to him protection from dissipation by the mortgagor of the rents or proceeds of the mortgaged property. If the property be rent property, these rents are to be paid either into the custody of the court, or to some one named by the court, to hold for the mortgagee's protection; if it be homestead property, the court is directed to fix the rental value and to require the mortgagor to pay such rent, in the same manner as in the case of rent property. In the instant case, the property being a homestead, the court fixed the rental value at $8 per month, and requires appellee to pay such sum monthly to a designated person. The law, therefore, gives to the mortgagee, during the existence of the stay order, all of the protection conditions would warrant, and, at the same time, carry out the purpose of the enactment.

■■ Were conditions, affecting the public welfare at the time of this enactment, such as to warrant the passage of this law as an emergency measure? The determination of this question rested primarily with the Legislature. The members of such body are fresh from the people and are from every section of the state; presumably they know the financial and economic conditions of the respective sections from which they come. Section 12 of this act, the emergency clause, declares the reason which moved the Legislature to pass this emergency act to be "that an extraordinary financial emergency and depression exists within this State and elsewhere, and that many citizens are threatened with destructive suits for the recovery of money and to the foreclosure of liens upon property. * * *" While such declaration by the lawmaking power is entitled to great weight, in determining the constitutionality of this act, yet it is not conclusive on the courts, especially when the legislation, to some extent, impairs the obligation of an existing contract. See the Housing Cases, above cited.

■ Did the conditions upon which the Legislature acted, in fact, warrant this legis-

lation? Current history, of which courts take judicial knowledge, shows that our credit system had collapsed, to such an extent that the President of the nation and the Governor of this and other states had issued bank moratorium proclamations; it shows that heads of families, numbered in the millions in the nation, were thrown out of gainful employment, and that this state had its proportionate number of such persons; it shows that market values had diminished, to the extent that it was far below the measure of the intrinsic value, either of land or its products; it shows that thousands of citizens of this state, who had theretofore used their savings in part payment of homes in our towns and cities, and of farms in our rural districts, with a then justified expectation of being able to meet the obligations thus created, found themselves without employment, unable to market their farm products, except at ruinous prices, and necessarily defaulting in their obligations; they were not only threatened with foreclosure and loss of home and farm, but also with the burden of a debt, because, under the financial conditions, the property would not bring sufficient to pay the debt against it; it shows that, under the stress of such conditions, Congress, with all speed, was enacting emergency laws for the nation, clothing the President with unusual powers, for the purpose of restoring a system of credit and a market value for products. Millions of dollars were appropriated for the express purpose of opening new employment to the unemployed, to aid in the restoration of market values and rebuilding of a credit system. The Legislatures of many states, especially those states in which agriculture is the dominant industry, were joining forces with the national government to meet such emergency, by enacting, among other emergency measures, the same character of law as was enacted in this state.

This law, and the similar laws of other states, must be considered as a part of the nation's effort to recover from a depression, national in scope and unprecedented in proportions. We must conclude that it was the belief of the Legislature that, with all the forces thus put forth to restore financial confidence, there would be, in the near future, a restoration of market values, and hence the law in question, by its own terms, is to cease to exist after May 1, 1934.

We have been favored with an advance copy of an opinion from the Supreme Court of Minnesota, in the case of Blaisdell v. Home Building & Loan Association, 249 N. W. 334, 86 A. L. R. 1507, rendered July 7, 1933, sustaining the constitutionality of an emergency measure, apparently similar to the measure under consideration; also with a copy of an opinion rendered by the New York Supreme Court (an intermediate court) in the case of McCarty et al. v. Prudence-Bonds Corporation, 149 Misc. 13, 266 N. Y. S. 629, sustaining the constitutionality of an emergency act of the state of New York, apparently similar to the act under consideration. These decisions are cited as authorities to sustain the holding in the instant case.

■■ We therefore conclude that the Legislature was justified in declaring that "an extraordinary financial emergency and depression exists within this State and elsewhere," and that such conditions warranted the Legislature in passing this emergency law, and that such legislative action is "the lawful exercise of legitimate governmental powers" in the interest of the public welfare. This emergency act is held to be constitutional, and the judgment of the lower court is affirmed.

Affirmed.