AMÉRICO MIRANDA, Petitioner, *v.* DISTRICT COURT OF SAN JUAN, Respondent.

No. 1542. Argued November 15, 1943.—Decided March 6, 1944.

*Dubón & Ochoteco* and *Otero Suro & Otero Suro* for petitioner. *Hartzell, Kelley & Hartzell* for intervener, defendant in the main action.

MR. ACTING CHIEF JUSTICE TRAVIESO delivered the opinion of the court.

Rafael Menéndez Ramos, owner of a house in Miramar, Santurce, leased it to José María Jarabo, under a verbal contract of letting from month to month, at a monthly rental of $75. On June 7, 1943, Menéndez sold the house to petitioner Miranda, who did not acknowledge or renew the lease contract. On July 6, 1943, Miranda requested Jarabo to vacate the house, claiming that he needed it as a dwelling for his family, and returned a draft for $75 covering the last monthly rental. Jarabo refused to vacate the premises, and thereupon Miranda brought an action of unlawful detainer

at sufferance against him in the District Court of San Juan. Jarabo in his answer denied that he was occupying the house at sufferance; he set up his contract with Menéndez, and as a special defense he alleged that the plaintiff lives at present in a house which is his property and has been such within the year preceding the commencement of the action of unlawful detainer.

The lower court rendered judgment for the defendant, whereupon the plaintiff instituted the present certiorari proceeding. In view of the fact that the question involved is a matter of great public interest, the writer of this opinion, as Acting Judge in Vacation (*juez de turno*), issued the writ returnable to the full court, which heard the case.

The grounds relied on for the present proceeding are as follows:

1st. That Act No. 14 of November 21, 1941 (Spec. Sess. Laws, p. 44), is not applicable to cases of unlawful detainer at sufferance, nor to those where there is no contractual relation whatsoever between the owner and the occupant of the real property, nor to those where the leased property is sold and the purchaser chooses to disregard the unrecorded contract entered into between the tenant and the former owner.

2d. That said act deprives the petitioner of his property without due process of law, denies him the equal protection of the laws, and impairs the obligation of contracts, thus violating the provisions contained in the first and fifth paragraphs of § 2 of our Organic Act.

3d. That the purpose of said Act is to amend §§ 2, 6, 9, and 17 of the Unlawful Detainer Act, yet its title fails to express such purpose and so much of the latter Act as was apparently sought to be amended has not been reenacted or published at length, all which is in contravention of the provisions set forth in the eighth and ninth paragraphs of § 34 of our Organic Act.

■ José María Jarabo is not in possession of the property as a tenant at sufferance. He took possession and enjoyed the property under a contract with the former owner thereof which, not being recorded in the registry of property, terminated as soon as the house was acquired by Miranda, who refused to continue the existing lease. Manresa, *Comentarios, Ley de Enjuiciamiento Civil*, 1910 ed., vol. 6, p. 27. *Sosa* v. *Río Grande Agrícola Co., Ltd.*, (1911) 17 P. R. R. 1106, 1109; *O'Rourke* v. *Pacheco*, (1912) 18 P. R. R. 943, 946; *López* v. *Central Eureka, Inc.*, (1919) 27 P. R. R. 271, 273 *et seq.*; *Cuesta* v. *Ortiz*, (1921) 29 P. R. R. 460, 462 *et seq.*; *Angleró* v. *Fernández*, (1922) 31 P. R. R. 249, 251; *Arrache et al.* v. *Carlson*, (1924) 33 P. R. R. 243, 246; *Flores* v. *Delgado*, (1925) 34 P.R.R. 745–747. It is accordingly provided in the first paragraph of § 1461 of the Civil Code (1930 ed.) that "The purchaser of a leased estate has a right to terminate the lease in force at the time of making the sale, unless the contrary is stipulated, and the provisions of the Mortgage Law prevent."

Commenting on § 1571 of the Spanish Civil Code, which is equivalent to § 1461 of our Code, Manresa says:

"By this section the Code has evidently provided a new ground for unlawful detainer which, unlike the others we have examined, does not arise from an act or omission on the part of the lessee, but from the act of alienation performed by the lessor, which in creating a new legal relationship positively affects the previously existing one by reason of the principles on which each of those relationships rests and of the subject matter common to them which is the leased property."

Manresa, vol. 10 (1908 ed.), p. 637.

Section 621 of the Code of Civil Procedure, 1933 ed., in its original form provided:

"The action of unlawful detainer will lie against the tenants, settlers (*colonos*), and other lessees of property, and against the administrators, agents, keepers, or guards placed in charge of the property by the owner thereof, or any other person who retains

the material possession thereof or enjoys the same by sufferance, without paying any rental or other consideration whatever.''

It is therefore evident that, in accordance with the provisions of § 1461 of the Civil Code and § 621 of the Code of Civil Procedure, plaintiff Miranda would be undoubtedly entitled to dispossess Jarabo as a wrongful occupant of the property.·

 How does Act No. 14 of 1941 affect·plaintiff's right to recover the possession of his property?

Said Act amended § 621 of the Code of Civil Procedure, *supra,* by adding thereto the following:

*"Provided, however,* That no proceeding shall be maintainable to recover the possession of real property in the urban and rural-districts of any municipality or of the Government of the Capital of Puerto Rico, occupied for dwelling purposes, except a proceeding to recover such possession on the ground. . . ''; and it went on to enumerate the cases where the action of unlawful detainer lies. They may be summarized thus:

(*a*) When, after the term of the contract has expired, and, for reasons of a moral nature, it is undesirable that the occupant shall continue in possession of the property.

(*b*) When the owner seeks in good faith to recover possession of all or part of the property as·a dwelling for himself or his family, provided the owner occupies a house which is not his property, nor has it been within the year preceding the commencement of the action..

(*c*) When the owner desires to demolish the premises with the intention of constructing a new building.

The Act further provides that in a proceeding to recover the possession of real property on the ground that the lease term has expired, an order of eviction shall. not be issued, unless the plaintiff proves that the proceeding is one mentioned in the ·exceptions above enumerated.

The language of the statute is clear and definite. It provides that no proceeding shall be maintainable to recover

the possession of a house occupied for dwelling purposes and situated within the urban and rural districts of any municipality or of the Capital of Puerto Rico, except where the plaintiff alleges and proves that his complaint is based on one or more of the exceptions contained in the Act itself.

In the instant case, plaintiff Miranda filed a complaint wherein he only alleged that he acquired the house by purchase from Menéndez Ramos; that the defendant withholds possession of the property and enjoys the same at sufferance, without there being any contract and without paying any rent or other consideration whatsoever; that the defendant occupies the house as a dwelling for himself and his family, and has refused to vacate it. The plaintiff did not allege that he desired the real property as a dwelling for himself or his family. However, the defendant in his answer alleged, by way of special defense, that Miranda "lives at present in a house which is his property and has been such within the year preceding the commencement of this action." The action was commenced on August 4, 1943. The lower court found that the petitioner lives in a house which, although not now his property, it was such on May 11, 1943, that is, within the year preceding the commencement of the action of unlawful detainer. This being so, the lower court did not err in holding that the complaint in this case is not comprised within the exceptions prescribed by the act, and that the same should be dismissed.

The second question to be decided by us is whether or not Act No. 14 of November 21, 1941, violates the provisions of the first and fifth paragraphs of § 2 of the Organic Act, that is, whether or not it deprives the plaintiff of his property without due process of law, or denies to him the equal protection of the laws, or in any way impairs the obligation of any contract.

According to the "Declaration of Policy" which serves as a preamble to said Act, the purpose sought by the lawmaker

in framing the statute was to protect the persons who during the present public emergency live with their families in leased houses, by preventing the landlords from exacting from tenants unjust, unreasonable, and oppressive agreements, "under stress of prevailing world conditions, of the national defense program of the United States, and of the emergency proclaimed by the President." The clear intention of the lawmaker was to protect every person in the possession of a leased house occupied by him and his family as a dwelling, by preventing his being required to surrender such possession pursuant to a purpose to exact from him the payment of a higher rent, or to lease the property to another tenant who would be willing to pay a higher rental charge. The Act expressly excepts those where the action of unlawful detainer is based on nonpayment of the stipulated rent.

That Act was framed for the sole purpose of meeting the existing emergency created by the present war, in which the whole of mankind is involved, is evident from the provision contained in the last paragraph of §1 of the Act, to the effect that the same shall be in force only until June 30, 1944.

During the first World War many cities, American as well as European, faced the problem of housing shortage which arose from the rapid increase of the population due to the influx of workers and other causes, which problem was aggravated by the stoppage of building. The situation became so serious by reason of the rental charges demanded by landlords from theirs tenants, that it became necessary for the government to intervene in order to protect the public against menaces to health, morality, and welfare. Accordingly, almost every civilized country enacted legislation tending to regulate contracts of lease of property occupied for dwelling purposes. (See 32 Am. Jur. 865, § § 1035 and 1036; *Block* v. *Hirsh*, (1920) 256 U. S. 135, 155.) In Spain, among other nations, a Royal Decree was issued providing for the compulsory extension of leases of urban properties

in cities of more than 20,000 inhabitants (R. D. of June 12, 1920, *"Enciclopedia Jurídica Española,"* Appendix 1920, p. 71), and in the United States two act's were passed, one by Congress regulating rents in the District of Columbia, known as the Ball Rent Law (Act of October 22, 1919, c. 80, tit. 11.— "District of Columbia Rents," 41 Stat. 297 *et. seq.*), and another by the Legislature of the State of New York known as the September Housing Laws (*People* v. *La Fetra,* (1931) 130 N. E. 601, 603; cc. 942–953, Laws of New York of 1920, p. 2477 *et seq.*), regulating rents in cities of a population of one million or more and their environs.

In Puerto Rico, since the beginning of the present war, a similar situation has arisen in housing conditions, and our Legislature felt bound to intervene in order to put a stop to a situation which seriously threatened the public health, morality, and welfare, and accordingly, in the exercise of its police power, it enacted a series of statutes among which we find Act No. 14 of 1941 now under discussion. Almost all these statutes are based on those enacted by Congress and by the Legislature of New York during the past War to which we have already referred.

In framing Act No. 14 of 1941, the lawmaker took as a model the statutes which had been enacted for similar purposes by Congress and by the Legislature of the State of New York. The constitutionality of the first of said statutes was upheld in *Block* v. *Hirsh* 256 U. S. 135, 65 L. ed. 865, and that of the second in *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170, 65 L. ed. 877. It seems advisable that we should make a detailed examination of these two decisions in order that their applicability to the case at bar may be fully realized.

In the former case Hirsh brought a proceeding to recover possession of the cellar and first floor of a building in Washington which Block held over after the expiration of a lease to him. Hirsh bought the building while the lease was run-

ning, and notified Block and required him to surrender the premises when the lease expired. Block declined to surrender the premises, relying upon § 109 of the Act of October 22, 1919, c. 80, tit. II—"District of Columbia Rents" (41 Stat. 297, 298, 301), which gave a tenant the right to hold over after the expiration of his term, so long as he paid the rent and performed the conditions as fixed by the lease. It was provided in the same section that the owner would have the right to possession for actual and *bona fide* occupancy by himself, or his wife, children, or dependents upon giving thirty days' notice in writing. Hirsh wanted the premises for his own use, but he refused to give the thirty days' notice, and alleged that the Act was unconstitutional because it deprived him of his property without due process of law and not for public use. It was so held by the Court of Appeals of the District of Columbia, and in reversing that decision, the Federal Supreme Court, speaking through Mr. Justice Holmes, said:

"No doubt it is true that a legislative declaration of facts that are material only as the ground for enacting a rule of law, for instance, that a certain use is a public one, may not be held conclusive by the Courts. (Citing authorities.) But a declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect. In this instance Congress stated a publicly notorious and almost world-wide fact. That the emergency declared by the statute did exist must be assumed, and the question is whether Congress was incompetent to meet it in the way in which it has been met by most of the civilized countries of the world.

"The general proposition to be maintained is that circumstances have clothed the letting of buildings in the District of Columbia with a public interest so great as to justify regulation by law. Plainly circumstances may so change in time or so differ in space as to clothe with such an interest what at other times or in other places would be a matter of purely private concern. (Citing authorities.) . . .

". . . These cases are enough to establish that a public exigency will justify the legislature in restricting property rights in land to a certain extent without compensation. . . . Congress has stated the unquestionable embarrassment of Government and danger to the public health in the existing condition of things. The space in Washington is necessarily monopolized in comparatively few hands, and letting portions of it is as much a business as any other. Housing is a necessary of life. All the elements of a public interest justifying some degree of public control are present. The only matter that seems to us open to debate is whether the statutes goes too far. . .

". . . The main point against the law is that tenants are allowed to remain in possession at the same rent that they have been paying, unless modified by the Commission established by the act, and that thus the use of the land and the right of the owner to do what he will with his own and to make what contract he pleases are cut down. But if the public interest be, established the regulation of rates is one of the first forms in which it is asserted, and the validity of such regulation has been settled since *Munn* v. *Illinois*, 94 U.S. 113, 24 L. ed. 77. . . . The regulation is put and justified only as a temporary measure. (Citing authorities.) A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change.

"Machinery is provided to secure to the landlord a reasonable rent. It may be assumed that the interpretation of 'reasonable' will deprive him in part at least of the power of profiting by the sudden influx of people to Washington caused by the needs of Government and the war, and thus of a right usually incident to fortunately situated property—of a part of the value of his property as defined in *International Harvester Co.* v. *Kentucky*, 234 U. S. 222. (Citing other authorities.) But while it is unjust to pursue such profits from a national misfortune with sweeping denunciations, the policy of restricting them has been embodied in taxation and is accepted. It goes little if at all farther than the restriction put upon the rights of the owner of money by the more debatable usury laws. The preference given to the tenant in possession is an almost necessary incident of the policy and is traditional in English law. If the tenant remained subject to the landlord's power to evict, the attempt to limit the landlord's demands would fail."

In *Marcus Brown Co.* v. *Feldman, supra,* the Federal Supreme Court upheld the constitutionality of the New York

statute (Chapters 942 and 947, Laws of New York, 1920), which is identical with ours, except that the latter provides, as an additional condition precedent to the landlord's right to recover possession of the property for use as a dwelling for himself and his family, that the plaintifff should be occupying a house which is not his property, nor has it been within the year preceding the commencement of the action. We must now decide whether or not that additional clause violates in any way the rights granted to petitioner Miranda by the above-cited provisions of our Organic Act.

The evident purpose of the lawmaker in adding to the New York enactment the provision under consideration was to protect the lessee holding possession at the termination of the contract upon the expiration of the lease or upon the refusal of the new landlord to recognize the same, against any scheme or subterfuge to which the new owner of the property might resort in seeking to render illusory the protection of the statute and to defeat the essential purpose of a temporary law enacted to meet an abnormal or emergency situation created by the present war. For that reason the lawmaker did not deem it sufficient to establish the requirement that the claim for recovery of possession of the property for dwelling purposes be made in good faith. He went further and demanded as proof of that good faith that at the time of the filing of the complaint the plaintiff landlord is not occupying a house which is his property or has been such within the year preceding the commencement of the action.

Act. No. 14 approved November 21, 1941, went into effect immediately after its approval and was therefore in force at the time of the events which have given rise to the present proceeding.

According to the certificate of the Registrar of Property of San Juan, which was offered in evidence by defendant Jarabo and erroneously excluded by the lower court petitioner Miranda, on November 19, 1940, purchased a lot in the Con-

dado and built thereon a dwelling house which was recorded in his name pursuant to a deed of February 10, 1941. On May 11, 1943, Miranda sold the house and lot to Walter Tischer, but continued to live in the house and still lived in it both at the time he purchased the house occupied by Jarabo —June 7, 1943—and at the time he brought the action of unlawful detainer herein—August 4, 1943.

We fail to find any reason for holding that, as a result of the additional requirement of our Act, Mr. Miranda has been deprived of his property without due process of law. On May 11, 1943, while the Act which we are discussing and the emergency which said Act sought to remedy were in full force, Miranda owned the dwelling house that he was occuping with his family. He knew—or should have known—that if he purchased a house which was occupied by a lessee, the latter could not be dispossessed, because the Act under consideration grants him the right to continue in possession of the house during the existence of the emergency proclaimed by the Act itself. Miranda had no problem whatsoever. He and his family occupied as owners the house which they now occupy as tenants. And we must assume that in selling the house they expected to obtain some profit, for it is a matter of common knowledge that during emergency periods, like the present one, the value of buildings is considerably increased. The situation in which the petitioner finds himself is a direct consequence of his own act. And, as there has been a failure to comply with the legal requisites that would enable the petitioner to demand, as the new owner of the property, the surrender to him of the possession thereof, the lower court did not err in dismissing the action of unlawful detainer. If such action could prosper under the circumstances of the present case, the essential purpose of the Act would be defeated, and we would have to admit that our Legislature is powerless to meet an emergency such as now exists.

■ The third ground of review assigned by the petitioner, in our opinion, lacks merit. In it he confined himself to the

assertion that §621 of the Code of Civil Procedure (1933 ed.) is legally nonexistent, and that, therefore, the same could not be amended by Act No. 14 of 1941.

According to the very brief of the petitioner (p. 27):

"By March 1933 the Joint Code Commission had already finished the new Code of Civil Procedure and the Legislature, by Act No. 6 of March 31, 1933, established the rules for the printing of the new Code. This Act in its pertinent part provides as follows:

" 'Section 1.—The Joint Code Commission of the Legislature of Puerto Rico is hereby authorized to adjust to the following rules the Code of Civil Procedure already finished by the said Commission.

Rule 1.— .
Rule 2.— .
Rule 3.— .
Rule 4.— .

Rule 5.—The Law of Special Legal Proceedings, approved in 1905, with all amendments thereto up to 1932, shall form Title XVI of the new Code of Civil Procedure. Its sections shall be renumbered to conform to the Code, but they shall keep the numeration they had in the original law, and shall be annotated with the jurisprudence of Puerto Rico from Volume 1 to Volume 44 of the Puerto Rico Reports. The equivalence of each section to that of the Spanish Code of Civil Procedure shall also be stated.

Rule 6.—. . . . . .' ''

It is true that the Legislature did not expressly include in said rules the Unlawful Detainer Act of March 9, 1905, but undoubtedly this was due to an oversight on the part of the Legislature. We say this because we think that the purpose of Act No. 6 of 1933 was to authorize the printing of a work already finished by the Joint Code Commission and, accordingly, the Act established a series of directory rules as to style, which should be observed when printing the code. Even admitting that the inclusion of the Unlawful Detainer Act in the code by the Joint Code Commission was unauthorized, the fact is that there exists an Unlawful Detainer Act in Puerto Rico which has not been repealed, and that the intention of the Legislature in passing Act No. 14 of 1941 was

to amend § 2 of said Act which appears in the Code of Civil Procedure under § 621.

In the third place, if the Commission was not authorized by the Legislature to include the Unlawful Detainer Act in the code, such action was implicitly ratified by the Legislature when it passed Act. No. 14 of 1941 amending § 621 of the code.

For the reasons stated the petition herein must be denied and the writ issued discharged.