María C. Blanes, peticionaria, *v.* Tribunal de Distrito de San Juan, Hon. Juez R. Cordovés Arana y Manuel Ledesma, etc., et al., demandados; Administración de Inquilinato de Puerto Rico, interventora.

Núm. 18.—*Sometido:* Enero 20, 1950. *Resuelto:* Abril 28, 1950.

*McConnell & Valdés*, abogados de la peticionaria; *Abraham Díaz González (Manuel Ledesma Dávila, pro se, en el alegato)*, abogado de la interventora.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Las partes estipularon ante el Tribunal de Distrito de San Juan someter el presente caso aceptando la certeza de los hechos alegados en el escrito de apelación. Esos hechos son los siguientes:

" 'La Casera es dueña de un edificio y solar situados en Avenida Ponce de León, Esq. Calle Cuevillas, Parada 12, Santurce, Puerto Rico.

· " 'La Casera obtuvo título al·solar que se menciona en 16 de julio de 1947, por compra a Don Edmundo Hernández, según escritura número 26 de esa misma fecha, ante Herbert S. McConnell.

" 'Sobre el referido solar la Casera construyó el edificio de referencia, comenzando su construcción durante los primeros días del mes de enero de 1948, y quedando éste terminado allá para el mes de mayo de 1948.

" 'El edificio en cuestión se dedica y siempre se ha dedicado exclusivamente a fines comerciales.

" 'Por contrato escrito con término de tres años efectivo a partir de 1 de junio de 1948, la Casera arrendó la totalidad de la primera planta del edificio de que se trata a D. José Santiago, Jr., por un canon estipulado y convenido de $450 mensuales. Con fecha 5 de agosto de 1948, previa radicación por la Casera de la planilla de inscripción del local en la Oficina de Inquilinato informando sobre el contrato efectuado con el Sr. Santiago, dicha oficina notificó a la Casera que quedaba aprobado el referido contrato y se fijó un alquiler máximo al local de $450 mensuales, por tres años.

" 'Por contrato escrito con término de dos años efectivo a partir de 1 de julio de 1948, la Casera arrendó una parte de la segunda planta del edificio de que se trata a Atlantic Southern Insurance Company of Puerto Rico, por un canon estipulado y convenido de $150 mensuales. Con fecha 10 de agosto de 1948, previa radicación por la Casera de la planilla de inscripción del local en la Oficina de Inquilinato informando sobre el contrato efectuado con la nombrada compañía, dicha Oficina de Inquilinato notificó a la Casera que quedaba aprobado el referido contrato y se fijó un alquiler máximo para el local de $150 al mes, por dos años.

" 'Por contrato escrito con término de dos años efectivo a partir de 1 de julio de 1948, la Casera arrendó una parte de la segunda planta del edificio de que se trata al Sr. Eliseo Martínez

por un canon convenido y estipulado de $100 mensuales. Con fecha 6 de agosto de 1948, previa radicación por parte de la Casera de la planilla de inscripción del local en la Oficina de Inquilinato informando sobre el contrato efectuado con el Sr. Martínez, dicha Oficina de Inquilinato notificó a la Casera que quedaba aprobado el referido contrato y se fijó un alquiler máximo de $100 mensuales para el local por un término de dos años.

" 'Las planillas de inscripción presentadas por la Casera a la Oficina de Inquilinato, cubriendo los locales de que se trata, no contienen información incompleta, equivocada o falsa. Por el contrario, se alega afirmativamente, que la información contenida en las planillas de inscripción presentadas por la Casera contienen información completa, correcta y cierta.

" 'Con fecha 21 de enero de 1949, la Casera fué notificada con tres órdenes de esa misma fecha, dictadas por la Oficina de Inquilinato y/o el Lic. Ledesma en su carácter de Administrador de dicha oficina, por ministerio de las cuales quedaron rebajados, con efecto retroactivo a 1 de diciembre de 1948, los cánones de arrendamiento anteriormente aprobados por la propia Oficina de Inquilinato con referencia a los tres locales de referencia. Los cánones en cuestión fueron rebajados en la siguiente forma: al Sr. Santiago de $450 mensuales a $375 mensuales; al Sr. Martínez de $100 mensuales a $67 mensuales; a Atlantic Southern Ins. Co. of P. R. de $150 mensuales a $140 mensuales o sea, una rebaja en la renta total del edificio de $700 mensuales a $582 mensuales.

" 'La Casera específicamente alega que a partir de la fecha en que el edificio en cuestión quedó por primera vez arrendado, no se han reducido o retirado las facilidades o servicios que recibían los inquilinos, ni se ha deteriorado el edificio o los locales, ni ha sufrido o desmejorado el vecindario o punto comercial que ocupa el edificio, ni ha habido queja o querella por parte de los inquilinos por estos motivos ni por ningún otro.

" 'La primera notificación que tuvo la Casera al efecto de que la Oficina de Inquilinato se proponía reajustar los cánones de arrendamiento aprobados en las fechas dichas, la recibió en 10 de diciembre de 1948, a través de una Notificación de Audiencia y Citación, fechada 9 de diciembre de 1948.

" 'Compareció la Casera a la Oficina de Inquilinato, y estipulados los hechos relativos al presente caso, dicha oficina dictó las primeras órdenes reajustando los cánones de los tres inquili-

nos con fecha 17 de enero de 1949, órdenes que se dejaron sin efecto por otras posteriores fechadas 21 de enero de 1949, de las cuales se establece la presente apelación.' "

Estipularon además que las únicas cuestiones a resolverse por el tribunal serían: "(a) Si la Oficina de Inquilinato, y/o su Administrador, tienen facultad en derecho para, bajo los hechos del presente caso, rebajar los cánones de arrendamiento originalmente fijados por la casera; (b) Si la propiedad de que se trata está, por ministerio de Ley, exenta de las disposiciones de LEY DE ALQUILERES RAZONABLES; y (c) Si de tener el Administrador facultad bajo la Ley para rebajar los cánones de arrendamiento en este caso, la tiene también para impartir a dichas órdenes efecto retroactivo."

Dicho tribunal resolvió que el edificio no estaba exento de las disposiciones de la Ley de Alquileres Razonables; que la Oficina de Inquilinato y su Administrador tenían facultad para reajustar, rebajándolos, los cánones de arrendamiento originalmente fijados por la casera y además, a darles efecto retroactivo.

Para revisar esta decisión expedimos el auto de *certiorari* en este caso, autorizado por la Ley núm. 464 de 25 de abril de 1946.

Sostiene la peticionaria que la corte inferior erró al no resolver que la Ley núm. 464 de 1946 ((1) pág. 1327) según enmendada es inconstitucional; al resolver que el Administrador de la Oficina de Inquilinato tiene facultad en derecho para dictar las órdenes impugnadas y al no resolver en forma definitiva si era válido o no el efecto retroactivo impartido por el Administrador a las órdenes apeladas e intimar que de haberse dictado una orden provisional sujetando la propiedad de la peticionaria a los términos de la Orden Administrativa número 4, el efecto retroactivo impartido a las órdenes apeladas es válido.

■■ En primer término sostiene la peticionaria que la Ley núm. 464 aprobada el 25 de abril de 1946, conocida como Ley de Alquileres Razonables es inconstitucional debido a que

al decretar la Asamblea Legislativa que existe un estado de emergencia para justificar la aprobación de la Ley no fijó un límite para su expiración, ni estableció bases o normas para que las cortes y/o el pueblo afectado pudiesen por sí determinar si el período de emergencia había cesado, siendo por tanto, dicha Ley una legislación de carácter permanente que está sujeta, no al cese de la emergencia decretada, sino a acción legislativa futura, dando la misma por terminada.

Ya pasamos sobre esta cuestión en el caso de *Cintrón* v. *Corte Municipal*, 67 D.P.R. 793, 800, donde dijimos:

"En cuanto al punto de que la Ley núm. 464 priva al demandante de su propiedad sin el debido procedimiento de ley, no se ha citado caso alguno que envuelva un estatuto sobre el control de alquileres para edificios comerciales. Sin embargo, no tenemos duda de que la Legislatura puede, bajo condiciones de guerra *y postguerra,* cuando los precios suben indebidamente y los materiales de construcción escasean, hacer uso del poder de policía para restringir los desahucios tanto de las viviendas como de los edificios comerciales, siempre y cuando que también disponga el pago de cánones razonables y equitativos. Véase *Latoni* v. *Corte,* supra, págs. 151-52." (Bastardillas nuestras.)

Y a la pág. 801:

"Está fuera de toda discusión el hecho de que el control de alquileres en un período de emergencia es válido. *Bowles* v. *Willingham,* 321 U.S. 503; *Fleming* v. *Rhodes,* supra; *Miranda* v. *Corte,* 63 D.P.R. 161. Y quizá se podría plausiblemente argumentar que una reglamentación similar de edificios comerciales es necesaria como un incidente al control sobre viviendas, para evitar se conviertan las propiedades de viviendas en propiedades para usos comerciales. De cualquier modo, el control de los alquileres de edificios comerciales, bajo las circunstancias prevalecientes en Puerto Rico cuando la Ley núm. 464 se aprobó, es un válido ejercicio del poder de policía independientemente del control de alquileres de viviendas."

█ Arguye la peticionaria que la legislación de esta naturaleza que ha sido sostenida como válida, siempre ha contenido un período fijo para la terminación de sus efectos y debido a ese hecho se ha sostenido su constitucionalidad, ci-

tando, entre otros, los casos de *Block* v. *Hirsh*, 256 U.S. 135; *Marcus Brown Co.* v. *Feldman*, 256 U.S. 170; pero que la Ley núm. 464 de 1946 no contiene disposición alguna en cuanto a cuándo habrá de considerarse terminada la emergencia que en ella se dice existe en relación con el problema de viviendas y el arrendamiento de edificios para negocios, y tampoco cuándo habrán de cesar los efectos de dicha Ley.

Esto es así, (1) pero no ha demostrado la peticionaria que la situación de emergencia que existía en 1946 al aprobarse la Ley núm. 464, reconocida por este Tribunal en el caso de *Cintrón*, supra, haya cesado. El hecho de que la Asamblea Legislativa no haya limitado los efectos de la Ley a un término fijo no la hace inconstitucional si las condiciones que existían al aprobarse aún subsisten. *People* v. *Title & Mortgage Guarantee Co.*, 190 N.E. 153 (New York, 1934), en el que se cita del de *Chastleton Corp.* v. *Sinclair*, 264 U.S. 543, 547, lo siguiente: "Una ley que depende de la existencia de una emergencia u otra situación de hechos para sostener su validez puede cesar de operar si la emergencia termina o los hechos cambian, aun cuando sea válida al aprobarse."

De manera que la fijación de un término para la vigencia de una ley aprobada bajo el poder policial para dar frente a una emergencia, puede o no ser determinativa de su validez, dependiendo de que en realidad continúe subsistiendo la emergencia que dió origen a su aprobación. En igual forma, y. aun cuando no se haya señalado un término fijo a la vigencia de la ley, si la emergencia continúa, no es necesariamente nula dicha ley. En uno y otro caso depende de que se pruebe que efectivamente no existe la emergencia en el momento en que se ataca la validez de la ley. *Cf. People* v. *Title & Mortgage Guarantee Co.*, supra, pág. 162. La peticionaria en este caso no sólo no demostró ante la corte inferior que había cesado la emergencia a que hace referencia la Ley núm. 464 sino que ni siquiera planteó esta cuestión ante dicha corte.

---

(1) Véase la Exposición de Motivos contenida en el artículo 1 de la Ley núm. 464 de 1946.

■■ Sostiene además la peticionaria que su propiedad está exenta de las disposiciones de la Ley de Alquileres Razonables de acuerdo con el artículo 24 de dicha Ley. Veamos.

En lo pertinente, el artículo 24 como fué aprobado originalmente por la Ley núm. 464 de 1946 decía:

"Artículo 24.—Con el propósito de estimular el programa de construcciones en Puerto Rico, por la presente se declara exenta de las disposiciones de esta Ley en cuanto al importe del canon a cobrarse durante la emergencia, toda propiedad de alquiler para negocios y propósitos comerciales e industriales *que empiece a edificarse efectivamente en o después del día primero de enero de 1946, y que se termine dentro del término de un año a contar de esa fecha, a menos que el Administrador, por causa justificada, prorrogare dicho término por un período que en ningún caso excederá de un año adicional.*" (Bastardillas nuestras.)

Por la Ley núm. 61 aprobada el 30 de abril de 1948 ((1) pág. 123), dicho artículo, en lo copiado, fué enmendado en esta forma:

"Artículo 24.—Con el propósito de estimular el progreso de construcciones en Puerto Rico, por la presente se declaran exentos de las disposiciones de esta Ley en cuanto al importe del canon a cobrarse durante la emergencia, toda propiedad de alquiler para negocios y propiedades comerciales e industriales *que se hubiere empezado a edificar el día 1ro. de enero de 1946, o en cualquier fecha posterior al día 1ro. de enero de 1946, siempre que dicha edificación se terminare o se termine dentro de un año a contar de la fecha en que fué empezada.*" (Bastardillas nuestras.)

Por la Ley núm. 7 de 19 de agosto de 1948 ((2) pág. 205), se enmendó de nuevo el artículo 24, disponiendo lo siguiente:

"Artículo 24.—Con el propósito de estimular el programa de construcciones en Puerto Rico, por la presente se declara exenta de las disposiciones de esta Ley en cuanto al importe del canon a cobrarse durante la emergencia, toda propiedad de alquiler para negocios y propósitos comerciales e industriales *que empiece a edificarse efectivamente en el transcurso del año 1946, y que se termine dentro del término de un año a contar de la fecha*

*en que se haya empezado a edificar efectivamente dicha propie-
dad, a menos que el Administrador, por causa justificada, pro-
rrogare dicho término por un período que en ningún caso exce-
derá de un año adicional."*   (Bastardillas nuestras.)

El edificio de la peticionaria se comenzó a edificar a prin-
cipios de enero de 1948 y se terminó de construir en mayo
de 1948.

La Corte inferior resolvió que si bien la propiedad de la
peticionaria gozó de la exención concedida por la primera en-
mienda al artículo 24 de acuerdo con la Ley núm. 61 de 1948,
supra, dicha exención cesó el 19 de agosto de 1948 al apro-
barse la enmienda a dicho artículo por la Ley núm. 7 de 1948,
supra, y en sus conclusiones de derecho se expresó, en parte,
así:

"Siendo dicha exención un privilegio o gracia concedida por
la Asamblea Legislativa, la misma podía ser alterada, modificada
o eliminada en cualquier momento por acción legislativa subsi-
guiente, no creando derechos de clase alguna a favor del dueño
de la propiedad exenta.   . . .

"A menos que la Legislatura no disponga específicamente que
la exención es de naturaleza contractual, ésta puede ser revocada
en cualquier momento.   Véase, como ejemplo de una exención
de naturaleza contractual, la 'Ley de Exención Industrial de Con-
tribuciones de Puerto Rico' (Ley núm. 184 del 13 de mayo de
1948), en cuya exposición de motivos se dispone que:

" 'A fin de que el incentivo que por la presente ley se brinda,
en forma de exención contributiva, para fomentar el desarrollo
industrial de Puerto Rico, sea un incentivo de base cierta y de
inconfundible seguridad, la Asamblea Legislativa de Puerto Rico
hace constar que considera toda exención contributiva concedida
bajo las disposiciones de esta ley como un contrato o convenio
entre el Gobierno de Puerto Rico y la industria que reciba el
beneficio de la exención, y que es su propósito no aprobar legis-
lación alguna que menoscabe o limite tal exención o pueda frus-
trar los fines de esta Ley.'

"Es un principio de derecho que aquéllos que actúan en
relación con materias que están comprendidas dentro del poder
de policía (*police power*) del Estado, están sujetos al ejercicio
de ese poder por la Legislatura, aun cuando dicho poder no se

hubiera ejercitado al tiempo de consumarse la acción. (Citas.).
Aun en casos de legislación con carácter retrospectivo, elemento
que no existe en este caso, se ha sostenido el ejercicio del poder
legislativo cuando el bienestar de la comunidad está envuelto.
(Citas.).

"No puede considerarse como un derecho adquirido en el
sentido constitucional de la frase aquello que no es más que la
esperanza de un beneficio futuro. (Citas.) La diferencia entre
un privilegio concedido a virtud de un estatuto y un derecho
adquirido es fundamental ya que el ciudadano no tiene derechos
adquiridos en privilegios de carácter estatutario. (Citas.)."

La peticionaria admite que si la Asamblea Legislativa
hubiera retirado la exención en forma uniforme, a "base de
que los dueños de edificaciones que gozaban de la exención
estaban haciendo indebido uso de ello, que tal retiro hubiera
sido válido", y va más allá y admite que "aún sin existir base
o justificación para ello, que también tal retiro sería válido
aun cuando la Legislatura quedaría en tal caso en la triste
posición de haber inducido a construir a personas que actua-
ron de buena fe en la creencia de la promesa de exención, para
luego aprovecharse y retirarles el privilegio." Insiste, sin
embargo, en que la cuestión que plantea "no es si la Legisla-
tura puede o no puede retirar un privilegio" sino que "retirar
tal privilegio y a la vez mantener una clase privilegiada [los
que construyeron efectivamente durante el año 1946] no es
posible dentro de nuestro sistema de ley", ya que la "legisla-
ción, por mandato constitucional, debe ser uniforme en su
aplicación y en su efecto; o debe haber una clasificación razo-
nable, si no existe la uniformidad, para que tal falta de
uniformidad se justifique. En este caso no existe la unifor-
midad y no existe la clasificación razonable."

No cita la peticionaria ningún caso para sostener las ante-
riores afirmaciones pues los que cita se refieren a las reglas
generales sobre interpretación de estatutos, y lo hace con el
propósito de que debemos determinar cuál pudo haber sido la
intención legislativa al aprobar la Ley núm. 7 de 1948. Se
refieren dichos casos, según admite en su alegato, al poder

que tienen las cortes para interpretar estatutos de contexto y significado ambiguos y que cuando existe tal inconsistencia, las cortes pueden armonizar sus diversas disposiciones. Arguye, por último, que cuando una ley es susceptible de dos o más interpretaciones, debe considerar el tribunal la forma más o menos opresiva en que cada interpretación opere. Y que en la forma en que fué interpretado el artículo 24 por la corte inferior, penaliza a personas que actuaron de buena fe descansando en una oferta de la Asamblea Legislativa. Empero, a renglón seguido, admite que "si bien es cierto que al actuar bajo tal oferta las personas que así lo hicieron no adquirieron derecho absoluto a la exención, no es menos cierto que los ciudadanos tienen derecho a descansar en la creencia de que su gobierno actúa movido por la buena fe y no por propósitos más o menos fraudulentos."

Hemos expuesto extensamente los argumentos de la peticionaria y creemos que los mismos sólo demuestran que lo que desea es que este Tribunal entre a considerar cuáles fueron los motivos que tuvo la Asamblea Legislativa para enmendar el artículo 24 en la forma en que lo hizo por la Ley núm. 7 de 1948 y para retirar la exención que había concedido y, en su consecuencia, resolver que no podía hacerlo. No es ésa nuestra misión. Admitido que la exención concedida a la peticionaria constituía un privilegio y no un derecho adquirido (*vested right*) por no tener la misma un carácter contractual, los motivos que haya podido tener el legislador para actuar en esa forma es cuestión que no compete a las cortes determinar. *Sonzinsky* v. *United States*, 300 U.S. 506, 513, donde se dice que "El inquirir los motivos ocultos que hayan movido al Congreso a ejercitar un poder constitucionalmente concedídole está más allá de la competencia de las cortes". Y aquí, la Asamblea Legislativa tenía el poder constitucional de retirar el privilegio de exención concedido, total o parcialmente. El efecto de la enmienda al artículo 24 en el 1948 fué limitar los efectos de la exención a aquéllos que efectivamente habían empezado a edificar en el año 1946.

No existe ninguna ambigüedad en los términos de la Ley que haga aplicables los casos citados por la peticionaria y que pueda justificar que los interpretemos en el sentido de que la Asamblea Legislativa lo que quiso decir fué que el privilegio concedido continuaría en vigor. El hecho de que al enmendarse el artículo 24 en el año 1948 se repitiera la frase introductoria del mismo al efecto de que la exención se concedía "Con el propósito de estimular el programa de construcciones en Puerto Rico. . ." no significa, como pretende la peticionaria, que en el año 1948 se estuviera estimulando algo que ya no podía hacerse. Esa frase introductoria es la misma usada desde que se aprobó la Ley núm. 464 en el año 1946 y a dicho año ha querido la Asamblea Legislativa limitar el efecto de la exención concedida.

Aun cuando fué interpretando la Ley núm. 201 de 14 de mayo de 1948, que enmendó el artículo 6 de la Ley núm. 464 de 1946, supra, en relación con el artículo 24 de dicha Ley, llegamos al mismo resultado que en el presente al resolver el caso de *Ledesma, Admor.* v. *Tribunal de Distrito, y Cuyar, interventor*, ante, pág. 87.

En cuanto al alegado efecto retroactivo de las órdenes dictadas por el Administrador en este caso, no existe, pues se hicieron efectivas el 1ro de diciembre de 1948, ya en vigor la Ley núm. 7 de 1948. También tratamos sobre esta cuestión en el caso de *Cuyar*, supra.

*Debe confirmarse la sentencia.*